266 F.2d 297
 59-1 USTC P 9360
 Anthony V. THOMAS, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
ESTATE of Joseph M. THOMAS, Deceased, Anthony V. Thomas,
Administrator, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
George J. THOMAS, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (two cases).
 Nos. 13401-13404.
 United States Court of Appeals Sixth Circuit.
 April 2, 1959.
 
 Everett H. Davidson, Lorain, Ohio, for petitioners.
 George F. Lynch, Washington, D.C., Charles K. Rice, Lee A. Jackson, Robert N. Anderson and S. Dee Hanson, Dept of Justice, Washington, D.C., on brief, for respondent.
 Before SIMONS, Chief Judge, McALLISTER, Circuit Judge, and JONES, District Judge.
 McALLISTER, Circuit Judge.
 
 
 1
 Anthony V. Thomas, Joseph M. Thomas and George J. Thomas were brothers and co-partners in a number of business enterprises. Joseph died in the fire of the Steamship Noronic at Toronto on September 17, 1949. Upon his death, more than $180,000 in cash was found in his safe deposit box. In the course of the administration of Joseph's estate, Anthony, George and the estate of Joseph were adjudged to be the owners of a one-third interest in the money, as copartners.
 
 
 2
 Just after the above-mentioned cash had been found in Joseph's safe deposit box, Anthony V. Thomas, in a conference with an Ohio State tax official in 1949, stated that he knew nothing about the amount of the cash on hand prior to the time the box was opened following the death of Joseph. From the evidence, it appeared that during the taxable year 1948, as distinguished from the other years involved, 1946, 1947, and 1949, there was a substantial amount of investments made by the partners, the source of which could not be identified by the government.
 
 
 3
 Upon discovery of the large amount of cash, the Internal Revenue Agents investigated the tax returns of the three brothers for the prior years 1946 to 1949 inclusive, which led to a determination of the Commissioner, based on the net worth method, that the three brothers had failed to report income in the total amount of $232,882.11, resulting in income tax deficiencies for those years.
 
 
 4
 On the prior review of the decisions of the Tax Court, this court, in an opinion by Judge Stewart, now Mr. Justice Stewart of the Supreme Court, reversed those decisions on the ground that the Commissioner's determinations of the amount of cash on hand for those years were based upon figures which were purely arbitrary estimates, bottomed upon assumptions shown to be entirely without foundation; and the cases were remanded for the admission of further evidence and for findings as to the petitioner's cash on hand at the commencement and termination of each of the tax years involved. Thomas v. Commissioner, 6 Cir., 223 F.2d 83.
 
 
 5
 Stated more comprehensively, the reason for the reversal of the former decisions of the Tax Court by this court was that the sole support for the Commissioner's determination (which had been sustained by the Tax Court) was that it was based upon figures arrived at in a conference between petitioner Anthony Thomas and Harold B. Herron, a tax official of the State of Ohio. Herron, a witness called by respondent, had testified in the Tax Court that his only purpose was to place the safe deposit cash on some personal property tax return of the State of Ohio; that his computations were inaccurate and hurriedly made; that he knew nothing at that time about the loans or investments of petitioners' that he did not know of two safes kept by the taxpayers at their place of business; that he would have been concerned had he known these facts and, in such a case, his computations would have been different; and that the figures he arrived at were necessarily only estimates by him, because it would have taken several months to have made accurate computations. In sum, the computations of Herron entered on the state tax return were made to procure a quick settlement of a claim for Ohio personal property taxes.
 
 
 6
 On the foregoing evidence, this court, therefore, held that 'Herron's calculations were thus nothing but guesswork. They were based upon the two underlying factual assumptions that the accumulation of money in the safe deposit box did not commence until March of 1945, and that the accumulation was built up by bank withdrawals to the extent of such withdrawals. These two basic assumptions were completely without foundation. The fact that Anthony Thomas agreed, in 1950, to the 'correctness' of the figures arrived at during the conference between Herron and the attorney, gave those figures no greater probative force, in view of the circumstances described in the record. The fact was that Anthony stated at the time that he did not know when and in what amounts the cash was accumulated, and it was on that basis that he came to the compromise agreement with Herron.
 
 
 7
 'The figures arrived at during the conference between Herron and the attorney were the sole support for the Commissioner's determinations of cash on hand at the biginning of the various years involved. Those figures had the inviting quality of apparent exactitude, and it is understandable why the Commissioner seized upon them. 'Bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them.' Holland v. United States, 348 U.S. (121) at page 128 (75 S.Ct. 127, 99 L.Ed. 150). Yet these figures were in fact merely arbitrary estimates bottomed upon assumptions shown to be entirely without foundation. Since the Commissioner's determinations of cash on hand for the various years were based entirely upon these figures, his determinations must fall, and the cases must be remanded to the Tax Court to determine the amounts of cash on hand which the petitioners had at the beginning of the year 1946 and of the three subsequent years.'
 
 
 8
 This court, at the time it reversed the decisions of the Tax Court, gave a lead to the government's further development of the cases when it said: 'It is recognized that such determinations may not be in figures as precise as Mr. Herron's convenient computation provided. However, there are lines of evidence even in the present record which suggest the proper approach to the problem, based, for example, upon the statement of Anthony Thomas to the Ohio State Commission that the fund had been accumulated by withdrawing cash from the various businesses of the taxpayers.'
 
 
 9
 Upon the hearing after remand, extensive additional testimony and exhibits were introduced by petitioners. Respondent offered no new testimony. Additional stipulations were entered by counsel, involving further testimony of witnesses, including the questions asked of Anthony and George Thomas by Internal Revenue agents at the time of their investigation of the taxpayers' records, and their answers. This particular evidence was, from various notations, referred to on the first hearing, but the full record of it was not heretofore in evidence.
 
 
 10
 After remand, and on the second hearing before it, the Tax Court found that the amounts of the joint pool's undeposited cash on hand on the following indicated dates were as follows:
 
 
 11
 January 1, 1946 .... $ 50,000.00
December 31, 1946 .. $ 85,000.00
December 31, 1947 .. $120,750.00
December 31, 1948 .. $151,200.00
 
 
 12
 This was a considerable change from the Tax Court's findings on the first hearing-- a change in the amount of $32,606 for 1945; of $44,413 for 1946; of $62,219 for 1947; and of $34,335 for 1948. By these findings, the alleged undisclosed income has been reduced in the last findings of the Tax Court as compared to the prior findings, by approximately $40,000, resulting in deficiencies for the years 1946 and 1947, but in overpayments for 1948 and 1949.
 
 
 13
 Petitioners contend that the findings of the Tax Court are clearly erroneous, being founded on nothing but vague theory and speculation.
 
 
 14
 In order to ascertain how the Tax Court arrived at its findings we turn to the findings themselves, but first, we refer to the prior hearing before the Tax Court, where, in its opinion, the Court recited at length how it arrived at its findings, in which it adopted the Commissioner's determinations as to the joint pool's undeposited cash on hand at the end of the relevant years. The first opinion of the Tax Court set forth the amounts of cash on hand, shown in the supplemental returns prepared by Herron and filed by Anthony Thomas on behalf of his deceased brother, Joseph, for the purpose of the Ohio personal property tax-- which had been agreed upon in the conference between Herron and Anthony Thomas and his attorney, held for the purpose of effecting a compromise settlement. The prior opinion of the Tax Court further set forth the method of computation adopted by the Court and the reasoning upon which it was based, and which sustained the Commissioner's determinations. But, as mentioned, all of the foregoing was heretofore held, on the prior appeal in this court, to be completely without probative force. There, the calculations of Herron were said to consist of nothing but guesswork, and the correctness of the figures arrived at during the abovementioned conference were stated to be only a compromise for a settlement; and this court held, because of such circumstances, that the Commissioner's determinations based thereon were founded on figures which were merely arbitrary assumptions, bottomed on assumptions, entirely without foundation; and it was for these reasons that the decisions were reversed.
 
 
 15
 What, then, were the findings of the Tax Court based upon, on the last hearing of the cases after remand?
 
 
 16
 Ashmus, the Internal Revenue agent who made the computations purporting to prove unreported income of the petitioners, testified on the second hearing, and stated, at the outset, that the figures showing cash on hand, used in the net worth analysis, were taken from the amended personal property tax return filed with the State of Ohio, which the agent had copied from the return prepared by Herron. Since the use of this return-- with Herron's calculations-- had been the reason why the cases were heretofore reversed on the prior appeal, it may naturally be asked in what different way the return was used on the last hearing, or what different or additional factors or considerations were thought to render it of probative value, or something other than an arbitrary estimate agreed upon for the settlement of a State tax claim. The answers seem to be as follows:
 
 
 17
 (1) Ashmus, the Internal Revenue agent, testified that he had interviewed the members of the pool-- that is, the surviving Thomas Brothers-- and questioned various witnesses; (2) that he could find no positive evidence as to the amount of cash on hand at the end of any particular year; (3) 'and that therefore we used the best secondary evidence available, which were the amended personal property tax returns.' The circumstances above mentioned by the Internal Revenue agent, however, did not infuse the personal property tax returns with any more probative value than they had on the first hearing.
 
 
 18
 Whatever the case, it is obscure how the Commissioner, after remand, used the calculations of the amended tax returns prepared by Herron to arrive at what he claimed to be the joint pool's undeposited cash on hand at the beginning of each of the tax years in question. It appears, however, that the Commissioner in his brief,[1] submitted to the Tax Court, argued that the method that should be used to compute the amount of cash on hand for each of the taxable years was to work back from the known amount of $180,479.00, which was inventoried when the safe deposit box was opened in December, 1949. The method adopted by the Commissioner, according to his brief, was then to level out the year 1948. Only nine months of 1949 being involved, the proper method of computation according to the Commissioner was to work back from the amount inventoried to ascertain the pool's undeposited cash on hand for the prior years by an algebraic computation, the solution, according to the Commissioner, being as follows:
 
 
 19
 'Taking this last algebraic expression and equating it with the actual cash on hand as of September 17, 1949, a solution may be obtained as follows:
 
 
 20
 4 3/4 X - $45,000 = $180,479
 19/4 X = $225,479
 X = $ 47,470
 
 
 21
 Substituting for X for each year involved results in the following estimated amounts of cash on hand:
 
 
 22
 12/31/45 12/31/46 12/31/47 12/31/48
---------- ---------- ----------- ------------
$47,470.00 $94,940.00 $142,410.00 $144,880.00"
 
 
 23
 In its opinion, the Tax Court stated that 'since it is not known how much cash was actually accumulated in any year and how much was actually on hand on any of the crucial dates, the proper solution of the question before us is to make an allocation of the $180,479 found in Joseph's safe deposit box to the dates of January 1, 1946 and December 31 of the years 1946 through 1948. Under his proposed allocation, the respondent asks that we find that the pool's cash on hand on the indicated dates was as follows:
 
 
 24
 January 1, 1946 .... $ 47,470
December 31, 1946 .. $ 94,940
December 31, 1947 .. $142,410
December 31, 1948 .. $144,880"
 
 
 25
 However, the Tax Court, on remand, did not accept respondent's algebraic computation but found, as above mentioned, that the amounts of the joint pool's undeposited cash on hand on the dates in question were entirely different from those submitted by respondent.
 
 
 26
 In considering the second review of the cases, this court has before it these varying computations of the government as to the joint pool's undistributed cash on hand.
 
 
 27
 Determined by
 Commissioner and Claimed, on Found by Tax
 found by Tax Court remand by Court on
 on first hearing Commissioner remand
Jan. 1, 1946 .......... $ 17,394.00 $ 47,470.00 $ 50,000.00
Dec. 31, 1946 ........... 40,587.00 94,940.00 85,000.00
Dec. 31, 1947 ........... 58,531.00 142,410.00 120,750.00
Dec. 31, 1948 .......... 115,865.00 144,880.00 151,200.00
 
 
 28
 With regard to the findings of the Tax Court on remand, as to the amounts of the joint pool's undistributed cash on hand at the beginning of the tax years in question-- as above set forth-- which here, as on the prior appeal, constitute the crucial point in the case-- there is no way of ascertaining, from the record, what method of computation was used, or what basis the Tax Court had for its determination. In its determination on the first hearing, the Tax Court recited how it arrived at its conclusion: it set forth the amounts of cash on hand, shown in the supplemental return filed by Anthony Thomas on behalf of his deceased brother, Joseph, for Ohio State personal tax purposes (which had been agreed upon between the State tax official and Anthony and his lawyer); and it outlined the method of computation adopted by the Court and the reasoning upon which it was based.
 
 
 29
 Instead of setting forth, or even mentioning any method of computation or reasoning, or recital of evidence upon which it acted, as it did in its prior decision, the Tax Court gave no grounds, in its opinion, for its conclusion on the crucial question, but starkly stated:
 
 
 30
 'The amounts of the joint pool's undeposited cash on hand on the following indicated dates were as follows:
 
 
 31
 January 1, 1946 .... $ 50,000
December 31, 1946 .. 85,000
December 31, 1947 .. 120,750
December 31, 1948 .. 151,200"
 
 
 32
 Did the Tax Court take into consideration or rely upon, in any way, Herron's calculations and the personal property tax return prepared by him in the estate of Joseph Thomas?
 
 
 33
 The findings of the Tax Court, with no indication in its opinion of how it arrived at its determination, and with no mention of the Herron calculations which had, for the second time, been emphasized and relied upon in the testimony of Ashmus, the Internal Revenue agent, on the hearing after remand, led this court to inquire further into the matter, after the arguments; and it directed the Clerk of the court to ask government counsel, in writing, certain questions. The first of these inquiries was as follows:'The court wishes to ascertain what basis the Tax Court has for its determination of the amounts of the joint pool's undistributed cash, as found on the second hearing.'
 
 Government counsel answered:
 
 34
 'The question concerning the basis of the Tax Court finding could be answered only in consultation with the Judge who wrote the opinion, and we do not feel that we could contact him in the absence of opposing counsel.'
 
 
 35
 The court then asked government counsel the further question:
 
 
 36
 'In the light of the previous letter addressed to counsel, does counsel have any idea what basis the Tax Court had for its determination of the amounts of the joint pool's undistributed cash, as found on the last hearing-- and, if so, what is such basis, and does counsel rely upon it now in seeking affirmance of the decision of the Tax Court?'
 
 
 37
 Government counsels' reply to this inquiry indicated that they had no idea what basis the Tax Court had for its determinations. They gave no answer to the question addressed to them. Instead, they stated that, under the given circumstances of the case-- which they recited-- it was incumbent upon the Tax Court as the trier of facts to allocate the amount of cash found in the safe deposit box among the four years of the taxable period.
 
 
 38
 The court addressed a further inquiry to government counsel:
 
 
 39
 'Does respondent rely in any amount-- and if so, in what amount, upon the computations of Herron, made in 1950, which this court previously held to be based on factual assumptions that the accumulation of money in the safe deposit box did not commence until March, 1945, and that the accumulation was built up by bank withdrawals to the extent of such withdrawals? These assumptions were heretofore held by this court to be completely without foundation.'
 
 Government counsels' reply was:
 
 40
 'The respondent (does not) rely to any extent upon the computations based on factual assumptions of Mr. Herron, representative of the Ohio Tax Commissioner, as to the accumulation of money exceeding $180,000 found in the safe deposit box after Joseph's death in September, 1949.'
 
 
 41
 A review of the testimony of Agent Ashmus, of the Internal Revenue Bureau, discloses that, in resorting to the net worth method of reconstructing petitioners' income during the taxable years in question, he relied, on both hearings, in computing the income of petitioners by the net worth method, upon the computations of Herron and the Ohio personal income tax returns; and the government and the Tax Court in turn relied upon Ashmus. On the second hearing, at the outset of his testimony, Ashmus stated:
 
 
 42
 'I would like to point out right here that the cash on hand used in the net worth analysis was taken from the amended personal property tax filed with the state of Ohio * * * We could find no positive evidence as to the amount of cash on hand at the end of any particular year * * * and, therefore, we used the best secondary evidence available, which was the amended personal property returns.'
 
 
 43
 The reliance upon this evidence was the reason for our prior reversal of the decisions of the Tax Court. Is there any additional factor which distinguishes the cases on this review from the prior review? We fail to see any difference. However, the testimony of Ashmus on the second hearing squints, but barely squints, at some other circumstance that was not mentioned on the prior hearing, although the evidence on both hearings, insofar as relevant on this aspect of this case, is identical. For Ashmus testified:
 
 
 44
 'We used that figure which appeared on (the) amended personal property tax return as being a reasonable amount in view of the taxpayers' past financial history, the amounts of income which they reported for income tax purposes in prior years.'
 
 
 45
 From Ashmus' use of these figures he concluded that the petitioners had undistributed cash on hand in the pool of only $47,470 on January 1, 1946. He stated that he arrived at his conclusions because petitioners had a history of borrowing money whenever they wanted to make large purchases, prior to 1945.
 
 
 46
 As far as their income goes, petitioners had reported for the years 1939-1945, inclusive, income in the amount of $126,899.25. For the years 1946-1948, inclusive, petitioners had reported income of $148,507.
 
 
 47
 Ashmus, and the respondent, knew what income petitioners had reported during all of the years in question and how much income tax had been paid thereon. This was not a new factor ascertained by the Tax Court on the hearing after remand.
 
 
 48
 With regard to the new circumstances purportedly considered by Ashmus at arriving at his conclusions by the net worth method-- that petitioners had been obliged to borrow money whenever they wanted to make large purchases prior to 1945-- this factor disappears into thin air when the undisputed facts are examined.
 
 
 49
 There was no history of the Thomas Brothers' actually borrowing money when they made large purchases prior to 1945. What the government relies upon on this aspect of the case are three chattel mortgage transactions. In the first of these, petitioners, at the time they moved from an old building to a new location, furnished the candy kitchen with new equipment, consisting, among other items, of a soda fountain. For this equipment they gave a chattel mortgage to the Ceveland Ice Cream Company. This transaction was entered into when petitioners became the ice cream company's first customers in Lorain, Ohio; and the evidence discloses that, at that time, petitioners were a very good outlet for the company, which was not well known in that city. Because of these circumstances, the ice cream company, as a gesture on its part of mutual assistance and friendly business relations, let the petitioners have the soda fountain and equipment, without payment of any interest on the chattel mortgage. In another instance, when petitioners purchased an expensive cash register for the first time, they took it on a chattel mortgage of $425.00, as 'insurance that the register work before we paid for it in full.' The third instance did not involve the three petitioners, but only one of them, and did not carry any implication of the necessity on their part of borrowing in order to make a large purchase. This transaction involved Al, the brother, who had been given his share of the money by their father, and then had gone to law school, eventally becoming a lawyer. He had returned to Lorain, Ohio, took over the old confectionery store and, with his wife, remodeled the place above the store for his law office and living quarters. Al's wife wanted to 'make something fancy' out of the old confectionery store. She managed it and invested considerable money in fixtures and ice cream making equipment, and, as George Thomas testified: 'That is when things changed, from what was once a busy little store becoming a-- well, a place of isolation. It got too much for her, and Al was too busy with his law work and Anthony dropped out of school at that time and decided that he would take over and try to get something back into the old place * * *. So he gave (the wife of his brother, Al) a mortgage and ran the place and worked out a plan to help pay the mortgage off * * * he took it over from her * * *, she and he both owned it.' Anthony was buying his sister-in-law's interest in the confectionery and paying for it by giving her a chattel mortgage instead of cash, because petitioners 'operated (their) business with the idea in mind that any business should pay for itself rather than risk anything we saved in that business.' It was a transaction wholly between Anthony and his sisterin-law, who, at the time she sold the business, was obliged to take care of her husband Al, who had become sick and bedridden, and died a year or so later. The amount of the mortgage was $1850, which Anthony paid his sister-in-law about a year after giving her the chattel mortgage.
 
 
 50
 We can see nothing in the foregoing transactions that can be said to constitute any proof that petitioners had, prior to 1945, a history of borrowing money whenever they wanted to make large purchases; and it is our conclusion that the use of the net worth method based upon such assumption was without foundation.
 
 
 51
 As far as petitioners' need to borrow money when they wished to purchase property-- because they were hard pressed for funds prior to 1945-- the uncontradicted and admitted evidence is replete with instances that they had large sums of money and great interests in property prior to 1945. Thirty years before, their father had given them at the of his death all of the money he had saved. This was not a large amount, but it indicated the family purpose. Their mother, at her death in 1933, had left them and their sister an estate having a net value of $35,880. In 1943 Joseph Thomas had paid $30,000 in cash for the purchase of a parcel of property. Before that time Joseph was customarily exchanging smaller bills at his bank for bills in denominations of $1000 and $500. Anthony Thomas, also, in petitioners' business, changed smaller bills into those of the larger denominations prior to 1943. Harold Tisdale, of the Central Bank of Lorain, testified that prior to 1943, Joseph Thomas, from time to time, desired to exchange small bills for bills of $500 and $1,000 denominations, and that, acting for the bank, he exchanged what bills he had of the high denominations with Joseph. He also testified that often the bank was unable to make certain loans; that it was not 'in a position to make them'; but that, in such cases, on many different occasions, the bank referred such proposals to Joseph Thomas, as, and he made the loans instead of the bank. Joseph would pay the amount to the bank and receive the evidence of the loan, and the bank would afterward act as collecting agent for Joseph. When he made such loans, Joseph advanced the money in cash. Altogether, he advanced on such loans a total of $65,000 in cash. The teller of the Lorain Branch of the Cleveland Trust Company testified to the same effect, as to the exchange of large bills, and stated that for a year or two prior to 1943, he caused to be exchanged two or three $1,000 bills for bills of a smaller denomination. There seems no doubt that petitioners had on hand amounts each week approximating $25,000 in currency at one of their places of business to cash checks of working men on pay days. In addition to the above is the credible evidence that for nearly thirty years practically everything the three brothers earned in every business or employment in which they were engaged went into the joint business and pool. Under these circumstances the conclusion of Ashmus that petitioners were obliged to borrow money prior to 1945, even when they purchased a cash register, because of their being hard pressed for funds, is not tenable.
 
 
 52
 In addition to the above mentioned reasons given by Ashmus for resorting to the net worth method, he testified subsequently that his reason for 'circumventing' the books and records of petitioners' business enterprises was 'the expenditures or investments far exceeded their known source of income; the fact that there was a variance to the equity that each of the brothers had in each of these various enterprises; the fact that there was no accounting whatever for undeposited cash on hand, which is their stock in trade in the mortgage business; the fact that Anthony and George Thomas claimed a third of the cash that was found in the safety deposit box, whereas, as a matter of fact, for that year and for the years previous, they had withdrawn cash from the businesses in a small amount-- Anthony, I believe, $2400 a year.'We discuss these reasons, seriatim:
 
 
 53
 (1) That 'the expenditures or investments far exceeded their known source of income.' The expenditures or investments could reasonably have come from petitioners' income and the amounts they had saved during years of labor before 1945, together with the substantial estate left them by their mother.
 
 
 54
 (2) 'The fact that there was a variance to the equity that each of the brothers had in these enterprises.' This was not the case; the equity of each brother was one-third of each enterprise and was subsequently so admitted by the government.
 
 
 55
 (3) 'The fact that there was no accounting whatsoever for the undeposited cash on hand.' Petitioners insisted that this came largely from income accounted for in their income tax returns, and from their lifetime savings on hand before 1645, about which the government never made any inquiries.
 
 
 56
 (4) 'The fact that Anthony and George Thomas claimed a third of the cash that was found in the safe deposit box, whereas, as a matter of fact, they had withdrawn cash from the businesses in a small amount.' This factor which was relied upon by Ashmus proves to be of no probative value whatever. At first the government insisted that petitioners were not partners entitled to one-third interest. It was finally conceded that each of the three Thomas brothers owned the properties and businesses as one-third partners and was entitled to, and received one-third of the profits thereon. The individual business carried on by Joseph Thomas was the Broadway Building; and it is admitted that he correctly reported the income from that property.
 
 
 57
 In our prior opinion of reversal, it was indicated that there were lines of evidence in the record then before us 'which suggest the proper approach to the problem, based, for example, upon the statement of Anthony Thomas to the Ohio State Tax Commission that the 'fund (of cash on hand when the box was opened) had been accumulated by withdrawing cash from the various businesses of the taxpayer."
 
 
 58
 However, on all of the evidence now before us, it appears that the lead suggested by this court did not disclose, or tend to disclose, when the cash had been realized as income by petitioners from their many business enterprises.
 
 
 59
 There was no question that considerable cash had always been kept in the safes of the various places of business. But there was no evidence as to when such income had been received, or any evidence that it had been unreported income.
 
 
 60
 It was the chief contention of petitioners that the cash on hand at the time of the opening of the safe deposit box came from the earnings, profits and accumulations of petitioners' savings and businesses prior to 1946. Ashmus, the Internal Revenue agent who made the net worth computations, had never checked the savings, profits or accumulations of any of these businesses before 1946.
 
 
 61
 Ashmus testified that when he found the loans made by petitioners had been made in cash, he did not consider that their supply of cash on hand had been lessened, because an equivalent amount of cash might have gone into the pool since the time the loan had been made. When the taxpayers showed that, in his net worth statement, Ashmus had listed all of the loans that had been made from petitioners' cash on hand, but that he had not adjusted petitioners' cash account to show that the loans had been made therefrom, Ashmus' explanation was that 'there still may have been other monies which were added to that cash reserve, which would have the result of increasing the cash on hand during that period'; but he conceded that he had no evidence that the cash on hand was so increased to take the place of the cash that he showed on his statement was used to make the loans, 'other than your amended personal property tax returns.' Whenever he found that loans had been advanced, or purchases of property made from petitioners' cash on hand, be refused to adjust the amount of cash on hand on the ground that additional cash of the same amounts as those loaned or paid out may have been received as 'unreported income from other sources,' although he had no suspicion of what those sources might be. When he was asked to amplify his statement that there was the possibility of undisclosed income from other sources, he stated that such sources were unknown to him, saying: 'I can't amplify on what is unknown to me, but other possible sources would be gambling or what have you.' Although Ashmus stated that he investigated the possibility of gambling, there was no evidence whatever that the petitioners had ever gambled. The only other source of undisclosed income, in Ashmus' opinion, was 'what have you.' When Ashmus was asked whether he had any reason to disbelieve the statements of Anthony Thomas in regard to the bank accounts or cash on hand, his reply was: 'I think that in any tax case, a statement of substantial cash on hand during any beginning period is selfserving without factual evidence to back up their oral claims * * * of which Mr. Thomas submitted none,' although he answered every question that Ashmus asked him during the course of the examination. From the government's standpoint, it was impossible for petitioners to show that their cash had been used for loans or purchases-- of which complete records were kept-- since every time money was proved to have been paid out by petitioners for loans or purchases, the government, by virtue of its net worth computations, assumed that an equal amount of cash had been received by petitioners from some source of unreported income, concerning which there was no evidence or any suspicion on the part of anyone as to what that assumed source might be.
 
 
 62
 In view of petitioners' contentions and Ashmus' failure to investigate anything about their enterprises prior to the above date, the background of the Thomas family and their business enterprises becomes pertinent.
 
 
 63
 The father and mother of petitioners came from Syria to America. The father, and, in fact, the ancestors of the family, had been candymakers in Syria. When they came to Lorain, Ohio, the father opened a little candy store at the corner of Tenth and Broadway in this city. The candy store soon developed into a small lunch stand, which was open from five o'clock in the morning, for laboring men who would drop in to get the paper on the way to work. Neither the father nor the mother read or wrote English. Their son Joseph acted as bookkeeper. The father kept all his money in a bag at the house and, later on, got a safe and kept it there. He did a lot of buying in cash. Just before he died, the father called his sons Joseph and George to his bedside, and explained that all that he and his wife had worked for and saved for was for his sons' future, and was to be divided between Joseph, George and Anthony. His son Elias, known as Al, was already going to college, and had been given his proportion of the savings. Anthony was then in school. Al afterward became a lawyer and died at an early age, leaving a widow and child. After the father's death, Joseph was the active manager of the business. The mother of the boys helped them in the store; and George went to school, but always opened the store in the morning at five o'clock, and worked there long hours after school.
 
 
 64
 Joseph, as manager, continued to work in the store. His brother George afterward woked for nineteen years as an operator in motion picture theaters, and also as an electrician for three different contractors. All the money that George earned and all that Anthony saved out of working in the store, and in other jobs, went into the family pool. The three brothers later went into business as partners in a grill, consisting of a candy kitchen, ice cream parlor, and restaurant, at 20th and Broadway in Lorain; and they opened another store, the Nut Ranch, where they sold candy, popcorn, and nuts of various kinds. Later they became owners of the Broadway Recreation, a bowling alley, which they sold in January, 1947. They also started the 333 Bar in 1942, a liquor tavern described as a workingman's place of drinking. The Thomas Grill, which they owned, was also a night club.
 
 
 65
 George testified that he had never purchased any stocks, never made any independent investments of his own, never bought any property of his own, and never had any property of his own, with the exception of his share in the partnership. He further stated that he never had a salary but took from the business what money he and his wife needed to live on, starting with $18 a week, out of which he furnished his home; that Joseph lived a good share of the time with him and his wife, or with his sister, never paying anything to either George or to his sister for board or room rent; that none of them would consider taking anything for rent or board because all of their property and money was owned by the brothers. He testified that he had no interests outside of his home and family; that the home he lived in was owned by the brothers' partnership; that he paid $40 a month rent, which went to the partnership during all of the tax years in question; that whenever he ate at the Thomas Grill or had a drink, he paid for it, as did all of the brothers or members of their families, and that the money was rung up on the cash register which issued and kept receipts therefor; that he had no social life, and that during one stretch of seven years he never took a day off, working seven days a week; that neither he nor his wife had ever owned an automobile; that he came to work and traveled about the town by bus, or got a ride with others; that the car he owned at the time of the hearing was the one Joseph had owned at the time of his death; that Joseph had needed the car because he was the one that was always up late at night at the Grill, and had to have some way of going home; that George's wife had belonged to a women's card group for a short while and then had dropped out; and that whatever she spent she took out of her grocery money of $18 a week. George also testified that during the four tax years he had purchased three suits of clothes and had spent about $100 during that time for overalls.
 
 
 66
 On cross-examination, George testified that 'we had always been brought up to work for each other, with each other, for one common purpose, to provide a future security for ourselves,' and that the three brothers did not need any contract between them as there was never any doubt what they were working for. When he was asked whether he wondered where the large amount of money found in the safe deposit box came from, he answered: 'No need to wonder. I knew where it come from. I helped work for it and I helped put it there.' When asked how many years he had worked to put it there he replied: 'From the time I was a child, from the time I stepped in that store and sold a newspaper across the stand.'
 
 
 67
 Anthony, the youngest of the petitioners, testified that, in 1949, he paid $6 a week for his room rent, and that he resided with a couple who were 'in their eighties.' Joseph Thomas, the deceased brother and the manager of the various business activities, lived with his widowed sister. He paid nothing for his rooms or meals. When he went to Florida, he lived with her in a house that she rented.
 
 
 68
 All of the foregoing is credible evidence, and indicates that, with their lifetime savings which they invested in their business enterprises; with the property received from their mother's estate; with their plan and program of working, each for the other, for their financial security and success, from their early youth, they could well have accumulated the property and funds in their possession, prior to the taxable years in question.
 
 
 69
 There is nothing in the evidence that tends to contradict the foregoing. The fatal trip on the 'Noronic' which resulted in the death of Joseph appears to be the only time of recreation for him that ever entailed any more expense than his daily living. In spite of their wealth, the brothers lived extremely frugal lives, and they and their mother and sister all appeared to work and to save for each other-- and they lived as frugally after the year 1945, when the government claimed that they had acquired great wealth, as they had lived before, when, as a matter of fact, they could all have afforded to live as prosperous businessmen.
 
 
 70
 The government admitted that all of the income and profits from all of the income-producing assets, as contained in the Internal Revenue agent's audit, were fully reported by the taxpayers. Petitioners kept exeensive and detailed records kept extensive and detailed records he found them and the substantiating data accurate in every respect. He further stated that if he eliminated the 'cash on hand' which he had computed in his net worth analysis, it would be merely a statement of what he found in petitioners' books and records. It was stipulated by the parties that 'with the exception of the cash on hand which he (Ashmus) used * * * (the net worth analysis) is nothing but a restatement in balance sheet form of the taxpayers' records, books, loans, savings accounts, and everything else.' All of the books and records of petitioners were used and accepted as correct by the government except as to the cash on hand, in question, which was computed from the net worth analysis, based on the Ohio personal property tax returns that had been executed to effect a settlement with the state. The only unreported income claimed by the government was that which was arrived at by the agent's net worth analysis. At no place did the books and records indicate any unreported income for any of the petitioners' various businesses. The government found no evidence whatever of any source of unreported income or any indication of a likely source of unreported income for the aggregate of the various business enterprises, or any single business of petitioners. The books and the records were admitted to be accurate when checked against all of the items therein contained. In other words, as Ashmus testified, he could find nothing wrong with the books or records, and could find no other business of petitioner or source of income-- and the basis of the claimed unreported income was arrived at solely by the way in which he prepared the net worth analysis. In his interviews with petitioners, Anthony and George, they answered all his questions and he found nothing false or suspicious about what they told him.
 
 
 71
 We are of the opinion that the net worth analysis was based on estimates that, like those referred to in our prior opinion, were without foundation. It was erroneous for the Commissioner and for the Tax Court to rely upon the Ohio personal property tax returns, as we held in our prior opinion. There was no proof that petitioners were in straitened financial circumstances before 1945, or were obliged to borrow money when they made large purchases, as stated by Ashmus. Another reason given by Ashmus for resorting to the net worth method is found on examination to be based upon his mistaken view, now admittedly erroneous, that petitioners did not share as one-third partners in the assets and profits of the pool. The suggestion that there was no evidence that anyone had seen large sums of currency in the possession of the petitioners before 1945 is contradicted by the testimony of witnesses; and the proofs show that very large amounts of cash were paid from time to time by Joseph Thomas for various investments, before the taxable years here in question. It is to be remarked that many of the records of petitioners for the prior years had been destroyed in a fire, concerning which, however, no suspicion attaches. During those years, petitioners filed income tax returns and paid their taxes thereon, none of which was ever questioned by the Internal Revenue agents. Although petitioners maintained that their cash on hand resulted from accumulations during many years before the taxable period in question, no attempt was made by Ashmus to check on any of the petitioners' enterprises before those years.
 
 
 72
 The government started out to prove that petitioners had cash on hand as of January 1, 1946, of only $17,394. It charged that there was no evidence of any wealth on the part of petitioners prior to that time. But it claimed that during the following three years, 1946-1948 inclusive, and nine months of 1949, petitioners had a total income of $361,505, of which they reported $148,507.54. This left what the government claims is petitioners' unreported income for three years and nine months in the amount of $232,882.11. Where did this huge amount come from, in that comparatively short period? No one knows, or has any idea of any likely source of such income. Who received it? There is not a clue. How did three men whom the government claims were in such financial straits that they could not buy even a cash register without borrowing, before 1946, secure such profits in the three years afterward? What business did it come from? What was its source? No answer is offered to any of these questions. The receipt of such unreported income seems unlikely.
 
 
 73
 The government appears to have anchored its case upon Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. There the 'net worth' method of proof was used. Its confidence seems misplaced. There the evidence pointed with convincing persuasion to these salient facts: that the taxpayers, husband and wife, prior to the tax period had accumulated thousands of dollars of debts that they never paid; they lost their business; they lost their household furniture because of an unpaid balance of less than $100; they suffered a default judgment for $506.66; they were obliged to separate for eight years because it was to their economical advantage; the wife was obliged to support herself and her son by working in a motion picture house in one state, while her husband was in another state. The government negatived the possibility of the taxpayers accumulating any large sum before the taxable period. There was evidence that income from a hotel had not been included in the taxpayers' books and records. There was independent evidence of a likely source of unreported income. None of these circumstances is present in the instant case; and every attempt of the government to follow the Holland case, as to these items of proof has been abortive. In the Holland case it was said that it may sound fair to say that the taxpayer can explain the 'bulge' in his net worth, but that he may be entirely honest and yet unable to recount his financial history. '(Such) a rule would tend to shift the burden of proof.' In the instant case, the taxpayer who was the only person who knew when the cash went into the safe deposit box, met a sudden death. No suspicion attaches to his failure to give an explanation. Herron, the Ohio State tax official, upon whom the government relies as to the State personal property tax returns, stated that the money found in the box might have gone in there any time, and that he was satisfied that no one alive knew anything about the amount of money that had gone into the box. 'Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which * * * is * * * hard for the defendant to refute * * *. Appellate courts should review the cases bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation.' Holland v. United States, supra, 348 U.S. 129, 75 S.Ct. 131.
 
 
 74
 Under the circumstances disclosed upon this second review, and after an examination and study of the records on the two reviews, we find no justification for disregarding the petitioners' records and books of account and determining deficiencies by the net worth method.
 
 
 75
 In accordance with the foregoing the deficiencies are cancelled, and the decisions are reversed.
 
 
 
 [1]
 While respondent's brief is not in evidence, all references thereto in this opinion are set forth in petitioners' brief and are not questioned in respondent's answering brief