David H. SCHULTZ and Bessie Schultz,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17914.

United States Court of Appeals
Fifth Circuit.

May 30, 1960.

Bert B. Rand, Washington, D. C.,
Seymour Lieberman, Houston, Tex., for
petitioners, Trammell, Rand & Nathan,
Washington, D. C., of counsel.

Arthur I. Gould, Fred Youngman, Rob-
ert N. Anderson, Lee A. Jackson, Dept.
of Justice, Washington, D. C., Rollin A.
Transue, Sp. Atty., IRS., Arch M. Cant-
rall, Chief Counsel, IRS., Washington,
D. C., Charles K. Rice, Asst. Atty. Gen.,
for respondent.

Before RIVES, Chief Judge, and
HUTCHESON and BROWN, Circuit
Judges.

JOHN R. BROWN, Circuit Judge.

This case presents problems arising
under the net worth plus nondeductible

expenses method of reconstructing income. On the basis of it, the Commissioner asserted substantial deficiencies against Taxpayer (and his wife), together with penalties for fraud, 26 U.S.C.A. § 293(b), and under 26 U.S.C.A. § 294(d) (1) (B) & § 294(d) (2) [1939 I.R.C.] for the years 1946, 1947, 1948 and 1949. The Tax Court approved in principle, though its findings resulted in totals considerably less than those imposed by the Commissioner. The principal attack by Taxpayer is fourfold. First, upon the death of Tax Court Judge Rice, all should have started over again so it was error for Judge Raum to determine the case on the basis of the record heard before Judge Rice. Second, the net worth method was not usable since the Taxpayer in his various enterprises kept a full set of books. Third, under the net worth method, deductions from net worth within the reconstructed tax year should be determined by economic realities, not technical tax deductibility. Fourth, assuming application of the net worth method, as to various items proper treatment was not given. And, of course, to the extent that there was any deficiency remaining, Taxpayer challenged the fraud penalty.

As we are of the view that with respect to several specific items there was an inadequate treatment requiring a remand for further consideration, we find it unnecessary to discuss the facts in any detail. Moreover, since we conclude that the nature of the net worth method with its dovetailing of many seemingly unrelated items calls for a rehearing of the whole, not just specific items, it would be unwise to discuss those details. To the extent that we do, it is largely illustrative for we disavow any purpose here to direct what the Tax Court shall or may do on any one or more or all of the items or issues on remand. At the same time, in the interest of orderly administration and the advancement of a cause now eleven to fourteen years old and destined by the nature of the things to be two or three years older if it makes its way back to this Court, we deem it essential to set forth some controlling principles as to which the parties are at loggerheads.

## I.

As there will be a rehearing, we need not pass upon the contention that Judge Raum could not determine the case on the basis of the record before Judge Rice. We mention only that to the many cases urged pro and con [1] should be added Mac-Crowe's Estate v. Commissioner, 4 Cir., 1959, 264 F.2d 621; 4 Cir., 1958, 252 F.2d 293; 1956, 240 F.2d 841, in which the Fourth Circuit, after three appeals, expressly directed a complete rehearing.

1. The Taxpayer urges the analogy of F.R. Civ.P. 63, 28 U.S.C.A., see 7 Moore, Federal Practice § 63.05 at 1458; Makah Indian Tribe v. Schoettler, 9 Cir., 1951, 192 F.2d 224; Smith v. Dental Products Co., 7 Cir., 1948, 168 F.2d 516, 519; Federal Deposit Ins. Corp. v. Siraco, 2 Cir., 1949, 174 F.2d 360; Askania Werke, A. G. v. Helvering, 1938, 68 App.D.C. 315, 96 F.2d 717.

The Government stresses Internal Revenue Code (1954) § 7444, 26 U.S.C.A. § 7444 (§ 1103 of the 1939 Code, 26 U.S.C.A. § 1103); § 7459, 26 U.S.C.A. § 7459 (§ 1117 of the 1939 Code, 26 U.S.C.A. § 1117); § 7453, 26 U.S.C.A. § 7453 (§ 1111 of the 1939 Code, 26 U.S.C.A. § 1111); § 7460, 26 U.S.C.A. § 7460 (§ 1118 of the 1939 Code, 26 U.S.C.A. § 1118) relating to the administrative organization and operation of the Tax Court. And it stresses the following cases: Davidson v. Commissioner, 5 Cir., 1937, 91 F.2d 516; Powell v. Commissioner, 1 Cir., 1938, 94 F.2d 483; Seaside Improvement Co. v. Commissioner, 2 Cir., 1939, 105 F.2d 990, 992, certiorari denied 308 U.S. 618, 60 S. Ct. 263, 84 L.Ed. 516; Halle v. Commissioner, 2 Cir., 1949, 175 F.2d 500, 504, certiorari denied 338 U.S. 949, 70 S.Ct. 485, 94 L.Ed. 586; Amoroso v. Commissioner, 1 Cir., 1952, 193 F.2d 583, 586, certiorari denied 343 U.S. 926, 72 S.Ct. 759, 96 L.Ed. 1337; Towers v. Commissioner, 2 Cir., 1957, 247 F.2d 233, 234–235, certiorari denied 355 U.S. 914, 78 S. Ct. 343, 2 L.Ed.2d 274; Shahadi v. Commissioner, 3 Cir., 1959, 266 F.2d 495, 501–502, certiorari denied 361 U.S. 874, 80 S.Ct. 137, 4 L.Ed.2d 113; Garden City Feeder Co. v. Commissioner, 8 Cir., 1935, 75 F.2d 804; Heim v. Commissioner, 8 Cir., 1958, 251 F.2d 44, 48.

## II.

On the question of the use of the net worth method, we have no doubt of two things. First, the Taxpayer while stipulating to many of the factors in the Revenue Agent's net worth statement, clearly preserved his objections to the use of the method. He urges them here and may properly reurge them below on the remand order. Second, the Taxpayer has a basic misconception about the circumstances in which it may be used.

The Taxpayer insists that under § 41[2] the net income is to be computed in accordance with the method of accounting regularly employed by a taxpayer. Consequently, where a taxpayer keeps books and records, the Commission has the burden of first establishing that the records are faulty or either negligently or fraudulently fail to reflect items of income or disbursements. But this is clearly not so. This Court, with many others, is conscious of the dangers in the use of the net worth method[3] and will require that there be adequate evidence[4] to support a determination that the true income is represented by the process of reconstruction. But once that is satisfied, neither the method nor the evidence undergoes an added scrutiny because the taxpayer's books are to this extent disregarded. Indeed, the determination that the trier of fact had requisite basis for concluding that income was truly that shown by the reconstruction process is a simultaneous determination that no matter how neatly or diligently or consistently or conscientiously kept, the books and records were inadequate. Whatever doubts may have existed prior to Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, this is what we have now so held, Dupree v. United States, 5 Cir., 1955, 218 F.2d 781, and so have others. Davis v. Commissioner, 7 Cir., 1956, 239 F.2d 187.[5]

Without anticipating what the Tax Court may hold on the record to be made on the rehearing after remand, we think it appropriate to point out that on this record now before us, there was adequate basis for the use of the net worth method. There was, first, the admitted "under the table" payments to the Mexican banana sellers to get bananas then in short supply. There was also the

---

**2.** "§ 41. General rule

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *" 26 U.S. C.A. § 41 [1939 I.R.C.].

Somewhat related is § 54 of the 1939 Code, Records and Special returns:

"(a) By taxpayer. Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe." 26 U.S.C.A. § 54 [1939 I.R.C.].

**3.** Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822, 826; Polizzi v. Commissioner,

6 Cir., 1959, 265 F.2d 498, 502; Thomas v. Commissioner, 1 Cir., 1956, 232 F. 2d 520, 525; Thomas v. Commissioner, 6 Cir., 1955, 223 F.2d 83. Both Thomas cases were approved and followed by this Court in Phillips' Estate v. Commissioner, 5 Cir., 1957, 246 F.2d 209; see also the final action by the 6th Circuit in the latest appeal of the Thomas case, Thomas v. Commissioner, 6 Cir., 1959, 266 F.2d 297; Veino v. Fahs, 5 Cir., 1958, 257 F.2d 364; Gunn v. Commissioner, 8 Cir., 1957, 247 F.2d 359; Harp v. Commissioner, 6 Cir., 1959, 263 F.2d 139.

**4.** The standard for appeals from the Tax Court is the clearly erroneous concept under F.R.Civ.P. 52(a) for appeals from nonjury trials in the District Court. See 26 U.S.C.A. § 7482. Appeals from judgments entered in a jury trial are reviewed under the familiar substantial evidence rule. Marsh v. Illinois Central R. Co., 5 Cir., 1949, 175 F.2d 498.

**5.** § 41, note 2, supra, does have some bearing but it is primarily concerned with the accounting period (calendar or fiscal) and the accounting method (accrual or cash).

"over the ceiling" (OPA) receipts from American buyers to whom the bananas were sold. On one side of the border at least, these transactions were beyond the border of the law and merited the closest scrutiny since these excess payments and receipts were nowhere recorded. Similarly, one of Taxpayer's banana enterprises computed its distributable income to Taxpayer and his partners on an arbitrary 5% of the sales price received. This is what the books showed and on them, the tax returns were prepared. The sale and purchase records showing detailed delivery shipments by specific vessels from Mexico and the like sales of the same bananas to American buyers showed, however, that the price paid by Taxpayer's group to the Mexican vendors exceeded the price received from American buyers by $256,961.54. As it was uncontradicted that Taxpayer never sold to American buyers for a price less than that paid to Mexican vendors, the books understated income by at least 5% on this excess. More important, the net worth statements for at least two of the years established without doubt substantial income in excess of that shown by the books.[6]

### III.

To afford a more tangible basis on which to discuss the Taxpayer's third contention, it is helpful to refer briefly to a few of the items as to which, under ground four, Taxpayer makes specific complaint.

One may be described as the Haitian banana deal which turned out to be less of a banana bonanza than all thought. In 1947 Taxpayer with another American was importuned to acquire a 50% interest in an exclusive franchise for the purchase and shipment of 120,000 stems of bananas a month from the southern peninsula of Haiti. The other 50% was to go to persons high in or close to those in the Haitian Government. Taxpayer's share of the payment for the franchise was $67,500. The franchise was assigned to a Haitian corporation formed for that purpose. The stock was thereafter issued 50% to Taxpayer and his ally and 50% to the Haitian promoters. It is a brief, but fair, summary to say that the Haitians took off for Paris with all of the funds, and after a few months' operations at not more than 40,000 stems per month, the enterprise collapsed. One thing the banana investors learned about Haitian banana promotional schemes was that apparently the franchise was not very exclusive. If it was not virtually worthless by the end of 1947, the year of the investment, it seems assuredly so at the beginning or during the next year, 1948. In the net worth statement, this $67,500 was shown as an addition to assets in the year 1947. It was

6. There was really little difference between the Taxpayer and the Government as to the January 1, 1946 opening net worth. It was within $1,000 or $2,000 of $141,331.13. There was no dispute at all that there was a substantial increase in net worth as of the closing date, December 31, 1946. For all practical purposes, there is no real dispute on the amount. The Taxpayer's computation of admitted increase was $22,720.44 producing, with nondeductible expenditures, a total net income of $42,075.23. This was in contrast to his reported income of $11,488.94 based on his books. For this period, the Government's calculations showed an increase in net worth of $29,686.62 and a total income of $49,041.41. The principal difference was in the refusal of the Tax Court to include as an opening asset approximately $10,000 for the Laviage debt and thereafter allow it as a deduction during the succeeding year, 1947, as essentially worthless. The figures just mentioned are from the findings by the Tax Court. On brief, Taxpayer's calculations are slightly more favorable but they still produce an income of $39,041.41 against a reported income of $11,488.94.

The year 1948 reflects a like absence of dispute. In the Tax Court's findings, the net increase contended by each was $23,027.67 to produce a corrected net income of $34,511.28 on Taxpayer's theory and $44,181.58 on the Government's calculations. This contrasted with the reported income of $15,278.44. On brief, giving Taxpayer full benefit of all of his contentions, his recomputations show a net worth increase of $21,109.77 and a corrected net income of $42,263.68.

carried throughout each succeeding year, 1948 and 1949.

Another item was the Schalker indebtedness. This represented genuine indebtedness of Schalker to Taxpayer incurred from moneys advanced by Taxpayer as he undertook in 1944 his new and brief business of lending as a factor. This was included as an opening asset for $18,117.01 in the January 1, 1946 opening statement. It was singled out for special treatment by Taxpayer because in 1947 Schalker filed a petition in bankruptcy. He was adjudged a bankrupt and discharged in 1947. It took a number of years to wind up the estate, but it seems quite clear that within the year of bankruptcy (or at least 1948), the maximum probable recovery by unsecured creditors was known or ascertainable to be substantially that ultimately recovered (6%) in 1953. Nevertheless it was carried as an asset at the full original value ($18,117.01) through the three net worth years, 1947, 1948, 1949.

Before the Tax Court and represented then by different counsel, Taxpayer urged that each of these items was deductible in the traditional income tax sense. The Haitian banana deal was urged as a loss by theft or fraud under § 23(e) (3). 26 U.S.C.A. § 23(e) (3) [1939 I.R.C.]. This was rejected by the Tax Court largely because Taxpayer had failed to show a requisite criminal act under Haitian law albeit the Tax Court, all counsel and this Court, labor with the vague expert testimony on what that law is. Likewise, looking at it in terms of the last act giving rise to the payment of the $67,500 the Tax Court treated it as an investment in corporate stock not shown to have become worthless. The Schalker factor loan was urged as an inclusion in 1946 opening net worth and a deduction in 1947, the year of bankruptcy, as a business bad debt under § 23(k) (1). 26 U.S.C.A. § 23(k) (1) [1939 I.R.C.]. The Tax Court held that since Taxpayer was not in the business of loaning money as a factor in the year (1947) the debt was claimed to have become worthless, it was a nonbusiness bad debt under § 23(k) (4) deductible as a capital loss and then only in the year (1953) it became totally worthless.

Here by new and resourceful counsel whose zeal sometimes make them slide too easily over stipulations made, the absence of which might have resulted in much different and more proof by the Government, the Taxpayer now asserts a most novel theory. It is that since net worth method is not an accounting system and not a basis, as such, for the imposition of income taxation and is really a determination of *economic* realities, what is added to or taken away from the worth each year to make it net must be ascertained on economic, not a technical income tax, basis.

With a candor that is initially beguiling, the Taxpayer as to the Haitian banana deal is totally indifferent "whether this loss was 'deductible' or not, under the Internal Revenue Code" because that "is neither here nor there." To carry this $67,500 in the net worth statement at the end of 1947 (the year of the investment) is, he insists, to carry a "phantom asset" which "created a 'phantom income.'" He continues this approach as to the Schalker debt contending that at least in the last net worth year (1949), the money invested in Schalker "had gone and vanished forever." He then reiterates "here, again, the technical question of business debt or non-business debt does not affect the undeniable conclusion that at the end of 1949 taxpayer was $18,000 poorer * * *" and "* * * conversely, the additional 'phantom asset' inexorably produces a corresponding 'phantom income' for which there is no logical explanation and on which no tax is due."

■ We agree with the Government that this approach is erroneous and misconceives the fundamental nature of net worth as a tax measuring device.

The net worth method as a basis for computation of income tax is actually a misnomer. Its hazards arise from the fact that the mere aggregation of assets

and a comparative increase or decrease are in themselves too equivocal. These do not tell how or in what manner the assets came into being, whether they represent mere exchanges or newly acquired properties, and especially are they too equivocal as to the *source* of funds used. Like bank accounts and bank balances, there may be great activity and recirculation of wealth but whether it is new or old or real may be far from revealed. Consequently, the method calls for development of all financial transactions during the tax year. For example, one element in the net worth method is the amount of personal living and other nondeductible expenses even though this has nothing to do with closing net worth. On the other hand, funds received by the Taxpayer during the year which would not be subject to tax must be ascertained, identified and excluded.

All of this is inherent in the process which, with our penchant for tags, all know as—and some shudder at—the net worth method. Its dangers are confessedly such that all are enjoined to give closest scrutiny to its application. But it is simple, so very simple, in its thesis: after excluding all sources of funds as to which the Taxpayer would not be subject to tax—such as prior savings, gifts bequests, non-taxable portion of capital gains, borrowed money and the like—the acquisition of new property or expenditures for noninvestment purposes must have come from *current* income. The net worth method is then finally a means of reconstructing all of these financial transactions with proper inclusion or exclusion of items as they bear on the actual reasonableness of the inference that since the funds had to come from somewhere and all others being excluded, those under review present current income.

Thus, the "investment" in 1947 of $67,500 in the Haitian banana deal is relevant, not because at the year's end there was much or anything of value remaining. It is solely relevant as a disbursement made during the year which had to come either from nontaxable sources or current income. It stands exactly as do the items for the family living expenses and, for the profligate, extravagant entertainment and gifts lavished upon favorite companions, though it is neither hoped nor expected that at the year's end there will be any marketable thing of value in the place of the money long since spent and gone forever.

Nor, on the other side of the economic question does a loss or diminution in value of an asset occurring within the year have any relevance in the process of a vicarious reconstruction of probable income sources. The Schalker debt, for example, does not represent any current expenditure or investment. Perhaps as an economic and legal matter, it should not, as to *succeeding* years, be any longer continued within the net worth statement. But if it is to be deducted within the year in which it has been first included, the deduction cannot be justified on the basis of economic factors since these do not bear on sources of probable income. The loss can have occurred, it can be real, and it can be measurable. The result may be that from an economic standpoint, the person's "net worth" at the year's end is less than at opening by this amount. But sustaining this economic loss in no way affects the amounts of money spent for new acquisitions or nondeductible expenditures from which the inference of current income is drawn. If a deduction is to be taken, it must be for a realized and recognized loss as an income tax deduction under the Revenue Code.

The error of the Taxpayer results, we think, from an undue emphasis on the *net* of net worth. This stems from the failure to realize that when the process of reconstruction is ended, the income tax is not predicated on worth, net or gross, nor upon one's accumulated wealth over outstanding debts, whether large or small. It is but a means of determining probable income. All factors bearing upon that quest are relevant and appropriate adjustment must be made. Only when

that process is ended does deductibility or exclusion of economic losses not related to that inference come into play. When they do, they rise or fall, succeed or fail, as do like losses suffered by a taxpayer whose books and records are completely adequate to reflect all of his income.

### IV.

While we thus disagree with Taxpayer's new look, we do consider that under the obligations imposed on the use of this net worth method, Holland v. United States, supra, some of the items were not adequately pursued and handled. We mention but a few.

There is, first, the Haitian banana deal. For reasons pointed out, the economic failure in 1947 does not exclude this expenditure from the ending net worth of that year (1947). There seems to be little doubt, however, that for succeeding years it had no real economic value. It certainly did not continue to have much worth. The extent to which it should be included in the opening assets of each succeeding year was not considered at all. It may well be that to delete it in succeeding years will augment, not decrease, ultimate tax liability. There is also some question whether the general approach to what, for all practical purposes, was a Caribbean swindle was a realistic one.

The Schalker debt is another. It was included as an item in the 1946 opening net worth statement. The Taxpayer did not object to that provided either in 1947 or by 1949 he could under his new theory deduct it from net worth. That he may not do that as an economic matter does not eliminate other doubts about this item. Theoretically, it had its face value ($18,117.01) at the beginning of 1946. But on this record, nothing suggests that Schalker's inability to pay and hence its worthlessness came from events adverse to Schalker in 1946. On January 1, 1946, was it really worth $18,117.01? What was its value? That is what counts. Cefalu v. Commissioner, 5 Cir., 1960, 276 F.2d 122. This is, of course, without regard to who is helped or hindered. Likewise, it now seems quite likely that upon the proper development of obvious leads, Holland v. United States, supra, the real value of this in terms of probable bankruptcy dividend was known in 1947 or at least long before the final and only dividend in 1953.

Another item is the attribution of $12,500 to Taxpayer on the receipt by him of the banana vessel "Bill Phil" in liquidation of one of his corporate enterprises. Substantial contributions by Taxpayer to this corporation were treated as investments in the net worth statement. The Government's case established the liquidation of the corporation and the distribution of the vessel to Taxpayer. There was evidence to justify a value of $12,500. But no effort was made to determine whether this was really *value* to Taxpayer. No effort was made to ascertain the accuracy of Taxpayer's statement that while the vessel was distributed to him, it was sold to pay seamen's wage claims. This warranted the ascertainment of the real truth for Taxpayer ought not to be prejudiced if he used the proceeds of the sale to satisfy seamen's claim, rather than put the ship under the marshal's hammer for sale at the direct instance of such maritime lienors. The seamen stood first down to the very last plank. Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907; The John G. Stevens, 1898, 170 U.S. 113, 119, 18 S.Ct. 544, 42 L.Ed. 969, 972.

Another item is the purchase of the Lee Laundry in 1949. This was included as a new asset in the 1949 net worth statement for $66,232.33. In the formal stipulation the parties "agreed that [this] * * * is a correct statement of [Taxpayer's] investment in the Lee Launders * * *." Perhaps the wording of this stipulation misled one or both of the parties, but it seems quite clear now that assertion of the transaction by the Government as an element of new assets required that the liabilities, primary or secondary, actually incurred by Taxpayer on mortgages given in the acquisition of this property should be reck-

oned with adequately. There is now considerable doubt that this stipulation was, or was intended as, an admission that Taxpayer had increased his assets by this $60,000 figure over and above liabilities incurred in its purchase. Significantly, in the net worth statement no liabilities whatsoever were shown with respect to this transaction though it is now uncontradicted by public records known to the Government that mortgage liabilities approached $200,000.

## V.

 There are other items some large, some small which we do not mention. All are to be re-examined. As the process of net worth reconstruction is a delicate one and may be used with assurance only when it seems certain that all factors have been properly treated and evaluated, we think it essential that all issues be redetermined by a rehearing. Stipulations are, of course, binding until the party is released by appropriate proceedings, but otherwise the whole matter is opened up and the Tax Court's findings and conclusions are vacated to enable Taxpayer and Government alike to offer full evidence [7] and assert contentions on all pertinent items and issues (including fraud and penalties). The parties are freed of informal concessions made during the hearing as well as findings or conclusions on any of the issues made or declared by the Tax Court. We repeat emphatically that the cause is remanded for a rehearing and nothing said or unsaid, expressed or implied, is to be taken or regarded as a holding or an indication or an intimation by us of the decision which must, ought, or may, be made by the Tax Court on the evidence it is to hear. That will be our function if and when, but only if and when, the cause comes back again and we there review it on the basis of the new record made.

Reversed and remanded for rehearing.

[7.] As these things are so complex and intertwined our remand contemplates that the matter be substantially a new hearing. Consistent with that objective, we do not, however, undertake to forbid or blueprint the possible use of portions of the testimony in the present record where this is reasonably required.