James E. Blatchford v. Commissioner.
Blatchford v. Commissioner
Docket No. 58107.
United States Tax Court
T.C. Memo 1963-83; 1963 Tax Ct. Memo LEXIS 261; 22 T.C.M. (CCH) 356; T.C.M. (RIA) 63083; March 21, 1963
Robert P. Smith, Esq., Bowen Bldg., Washington, D.C., Joseph W. Kiernan, Esq., and D. A. Baker, Esq., for petitioner. Paul E. Waring, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income taxes and additions thereto for the calendar years 1938 to 1947, inclusive, as follows: Additions to Tax
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(2)
1938
$ 11,918.50
$ 5,959.25
1939
327.44
163.72
1940
3,261.84
4,130.92
1941
26,126.49
13,063.25
1942
61,502.90
30,751.45
1943
111,733.77
55,866.89
1944
56,992.35
28,496.18
$3,817.20
1945
44,030.90
22,015.45
1946
170,666.66
85,333.33
1947
133,744.02
66,872.01
*262 The issues for our decision are: (1) Whether petitioner failed to report all of the taxable income he received during the years 1938 through 1947; and, if so, (2) whether any part of the deficiencies resulting from such failure was due to fraud with intent to evade the payment of taxes; (3) whether the statute of limitations bars assessment and collection of any of the deficiencies determined for the years 1938 to 1947, inclusive; and (4) whether the addition to tax under section 294(d)(2) was properly imposed on petitioner for the year 1944. Findings of Fact Certain facts were orally stipulated by the parties during the course of the trial of this proceeding, and such stipulations as were made are indicated in the transcript and incorporated herein as part of our findings by this reference. The petitioner resides at Hollidaysburg, Pennsylvania. He filed his income tax returns for all of the years involved in this proceeding with the then collector of internal revenue at Philadelphia, Pennsylvania. His returns for all of the taxable years (1938 through 1947) were timely filed either when due or within extension periods granted by the Commissioner. He has not executed any waiver *263 or entered into any agreement whereby he waived the statute of limitations. The Commissioner's notice determining the deficiencies herein was dated March 4, 1955. Petitioner has operated a retail store in Altoona, Pennsylvania, since 1934, in which he sold furniture, appliances, jewelry, and clothing. Petitioner's store was a sole proprietorship known as the Blatchford Furniture Company. In addition, he operated branch stores in the nearby Pennsylvania towns of Barnesboro and Tyrone. Petitioner maintained his books and records and filed his tax returns using the installment method of accounting. Petitioner conducted business essentially on a credit basis, requiring either small or no down payments on purchases made by his customers, with monthly or semimonthly payments until the balances were discharged. Some sales were made for cash, but cash sales and installment sales were not reported separately for tax purposes. The accounting system employed in petitioner's business centered around some socalled "window machines" produced by the National Cash Register Company. These machines required separate ledger cards for each customer on which all transactions pertaining to that *264 customer were recorded. The cards indicated accounts receivable if the sales were made on the installment basis or accounts payable if customers made deposits on items not available for immediate delivery. In addition, certain "hold" or "layaway" transactions, depending upon whether the item sold was furniture or clothing, were also noted on the ledger cards and reflected balances in favor of petitioner's customers. These ledger cards, together with certain inventory records, a check-and-invoice register of purchases and expenses, a notes-and-accounts-payable register, and some other books pertaining to assets and investments (such as securities and mortgage and rental properties) constituted petitioner's bookkeeping system. Each ledger card contained the customer's name and address, the type of merchandise purchased, the date of the sale, the name of the salesman, and the code letter of the clerk who recorded the sale. If a sale were made on the installment basis, the amount of the sale, the down payment, the balance due, and the terms of payment were all indicated on the ledger card. Customers making installment purchases were given duplicate ledger receipt books containing the *265 same information recorded on petitioner's ledger cards, and the numbers on these books corresponded with the numbers on the ledger cards. As a part of the procedure customers making installment purchases also signed installment contracts which bore numbers corresponding to those appearing on ledger cards pertaining to installment sales. When a customer came into petitioner's store to make an additional purchase or to make a payment, the cashier would place the receipt book and the customer's ledger card in the "window machine" and both documents would be posted simultaneously to indicate the amount, the date, and balance remaining to be paid. This operation was continued until the customer discharged the balance due. It was sometimes necessary to make a second or continuation card, which was attached to the first card. If customers made additional purchases on the installment bases their cards might be open over a period of from 3 to 9 years. Sales for cash were handled in a similar fashion. The salesman would go to the cash register and obtain a ledger card containing the name and address of the customer, the date of the sale, and the kind of merchandise purchased. This ledger *266 card would then be run through the "window machine" together with a copy of the sales slip which was given to the customer as a receipt. The so-called "hold" and "layaway" merchandise transactions were handled in much the same way, except that the ledger card would show the amount of the transaction, the amount of the deposit, and the balance due. The merchandise involved would be set aside until the customer made a sufficient number of payments, at which time the transaction was treated as a sale. If the customer failed to complete the payments, the merchandise was returned to stock and the money deposited by the customer was refunded. Such transactions were utilized by persons with bad credit ratings to obtain merchandise, but during the war years some consumer goods were in short supply and sizable deposits were made by many customers who needed appliances which were not available in the expectation that if petitioner could obtain the appliances they would buy them, and if he could not the deposits would be refunded. Such transactions were not treated as sales until the merchandise was delivered. About 15 percent of petitioner's total sales was handled on a "hold" basis. Sometime *267 in 1934 petitioner employed Helen Kemp to work in the bookkeeping department of the Blatchford Furniture Company and in all of the years involved herein she was petitioner's chief bookkeeper. Helen, as she will sometimes hereinafter be referred to, attended the public schools of Altoona where she "took the commercial course." She has never taken an accounting course and does not profess to be an accountant. She served as petitioner's head bookkeeper for about 20 years, having left his employ in 1956. All of petitioner's books and record were maintained under her supervision. In addition, Helen handled the payroll, the purchasing of merchandise, depositing of funds in various bank accounts, as well as compiling information for petitioner's tax returns. At the end of every business day Helen reconciled the cash received with the figures entered on the customer ledger cards. The same cash figure would appear on a tape attached to the cash register. Daily summary sheets were compiled and were subsequently used to compile monthly summary sheets. A yearly summary was then compiled from the assorted cash register tapes and monthly summaries in order to determine the progress of the business. *268 For tax purposes, however, it was necessary to refer to the ledger cards and allocate the cash received to the year of the original sale to which the cash collected was to be applied. This procedure would take almost 6 weeks. These summary sheets were filed away in a storeroom, and sometime prior to 1948 they were either lost or misplaced and cannot now be found. After Helen had computed the necessary figures she submitted various summaries, including a balance sheet, to a firm of public accountants known as Young & Company, which used the information so supplied to make petitioner's tax returns. The information submitted by Helen was not complete, and it was usually necessary for the accountants to adjust her figures before they could be used to make petitioner's tax returns. Petitioner's tax returns for the years 1936 and 1937 were examined by agents of the then Bureau of Internal Revenue. Upon completion of this examination, deficiencies totaling $1,418.40 were determined. These deficiencies were the result of faulty bookkeeping practices employed by the petitioner. The following excerpts from the examining officer's report indicate the nature of the difficulty: This taxpayer's *269 records certainly are not kept in a manner to properly reflect his income on the installment basis as required by the Regulations. It would be extremely difficult to prepare Exhibits reflecting gains and losses in the many repossession transactions, and the only way to determine the income by the installment method was to prepare balance sheets and establish the Reserve for Unrealized Profit at end of 1935, 1936 and 1937. Many transactions are not recorded in books. The bookkeeper has little conception of what is really meant by the "installment method." It is believed by this examiner that the tax liability reflected in this report is substantially correct. The fact is that the "Receipts Adjustments" shown on Schedules 3 and 8 represent the amounts which were required to tie the net income on the installment basis with the net worth figures at end of each year 1936 and 1937. The "Receipts Adjustments" in schedule 3, pertaining to 1936, amounted to $15,794.07 and had the effect of increasing gross profit for that year in the amount of $5,913.33. For the year 1937 the "Receipts Adjustments" amounted to $16,410.81 and increased gross profit by $6,494.84. A copy of the report *270 of examination was forwarded to Robert E. Young, a partner in the accounting firm of Young & Company, who was petitioner's "auditor" and possessed a "power of Attorney to represent the taxpayer in all tax matters." There is nothing in the record to indicate that corrective action was taken as a result of the examination of the returns for the taxable years 1936 and 1937. Sometime in 1941 some members of Young & Company reviewed petitioner's accounting system in an effort to discover the cause of discrepancy in the figures given them by Helen at the end of each year. They found that petitioner's basic accounting system was the standard one used by most installment furniture organizations. He did not have a general ledger in the accepted sense of the word, but as a substitute monthly summaries were used and later put into a yearly summary form. Certain changes were recommended by Young & Company to strengthen the system, but these changes were not put into effect by petitioner. Petitioner's return for the year 1944 was also examined by agents of the then Bureau of Internal Revenue and a deficiency of $53.66 was determined and paid as a result of the examination. The following excerpt *271 from the report of examination indicates the nature of the difficulty: Taxpayer using the installment method of accounting in reporting income has deducted bad debts of $1,167.31 in 1944. The amount claimed represents 100% of the bad debts, but he is only allowed to deduct 61.27% of the bad debts representing the remaining unrecovered cost of goods sold since he reported only 38.73% as gross profit under the installment method for tax purposes in 3 prior years. * * * Since the bad debts claimed represented accounts receivable of years 1941 to 1943 and would have required much time and searching of records to identify in which year they belonged, an average of the three years gross profits reported was taken to arrive at 38.73% as gross profit and 61.27% remaining unrecovered cost of goods sold for those years. Petitioner's tax return for the year 1944 was the last return prepared for him by Young & Company. The information submitted by Helen for the year 1945 was out of balance and Young & Company obtained an extension of the filing time from the Commissioner of Internal Revenue and requested a "complete story of their [petitioner's and Helen's] activities." Upon looking over *272 petitioner's records the accountants were particularly concerned because of discrepancies in recorded sales and the sales reported to them, and the fact that the "cash flow" could not be reconciled for petitioner had apparently spent more cash than he had received during that year. Petitioner rejected the accountants' suggestion that an audit of his books be made and decided that thereafter Helen Kemp would prepare his tax returns. Sometime in May 1948 Herman F. Kerner, who had been a revenue agent since March 1947, was assigned to investigate petitioner's income tax return for the year 1946. He talked to both petitioner and Helen in order to review the income reported from dividends and interest. Helen gave him a booklet published by Kidder, Peabody & Co. which contained various entries made by Helen relating to dividends received by petitioner. The entries in this booklet substantially agreed with the amount of dividends reported on petitioner's income tax return for the year 1946. At that time Kerner, as he will hereinafter be referred to, had in his possession certain information forms submitted by corporate taxpayers to advise the then Bureau of Internal Revenue of the payment *273 of such dividends and interest. In some instances such corporations furnish the taxpayers with duplicate copies of these forms, along with the checks sent in payment of the dividends and interest. Only the dividends and interest represented by such duplicate copies of information forms sent to respondent by the payors of the dividends and interest were entered in the Kidder, Peabody & Co. booklet. Kerner knew that petitioner had received dividends exceeding the amount reported on his return for 1946 and he pressed Helen and later, on the same morning, the petitioner to give him any further information that they had. Helen told him on that occasion that the Kidder, Peabody & Co. booklet was the only record relative to securities and contained all of the dividend income received by petitioner for the year 1946. In the conversation with petitioner, later in the morning, Kerner was advised by petitioner that whatever record was shown to Kerner by Helen constituted the only record which they had. Later in the afternoon Kerner again saw petitioner and told him that the problem of the discrepancies between the dividends reported and those actually received was still unresolved. Petitioner *274 then told Kerner to come back the following day and in the meantime he would make an effort to figure out the differences between the figures contained in the Kidder-Peabody booklet and the information already in Kerner's possession as to additional dividends. The next day, when Kerner returned, petitioner told Helen Kemp to give Kerner all of the information she had. She gave Kerner two bound ledger books which contained complete and detailed records of all of his security transactions as well as dividends received by petitioner. Upon checking these books with petitioner's brokers, Kerner found the books to be substantially correct. The entries in the bound books indicated dividends and capital gains in excess of those reported on petitioner's returns, and in all important respects the books agreed with the information Kerner had obtained from an examination of various accounts maintained for petitioner by his stock-brokers. As petitioner's security transactions were not begun until the fall of 1942, his books reflect no income from securities until the year 1943. The following is a summary of the dividends and interest payments actually received compared with those reported on *275 petitioner's returns: Year
Per Books
Per Returns
Difference
1943
$ 6,917.09
$ 610.84
$ 6,306.25
1944
13,687.36
2,839.74
10,847.62
1945
10,604.70
2,987.50
7,617.20
1946
11,133.95
5,571.88
5,562.07
1947
11,329.50
4,418.70
6,910.80
During the years 1943 through 1947 petitioner's reported capital gains were substantially less than those actually received by petitioner, as indicated by the following summary: Short-Term Gains
Short-Term Losses
Net Long-Termgains
Year
Per Books
Per Returns
Per Books
Per Returns
Per Books
Per Returns
1943
$3,981.77
$ 1,119.64
$ (925.12)
1944
3,059.93
$452.16
713.92
$ 48.89
5,097.51
$ 3,777.33
1945
4,265.16
859.66
874.64
360.74
41,160.52
6,796.92
1946
834.81
514.91
10,154.85
11,012.93
(7,158.45)
(5,691.57)
1947
(12,392.75)
(11,388.01)
As a result of Kerner's findings, special agent Thomas J. Devine was assigned to investigate petitioner's returns on or about June 2, 1948. After looking over the Kidder-Peabody booklet and the two bound ledgers pertaining to security transactions, Devine requested and received petitioner's *276 permission to examine his bank accounts. He made a transcript of the petitioner's personal accounts, but he found the business accounts too voluminous and a similar analysis would have required too much time. Kerner reported the results of his initial investigation to his superiors and it was decided that a review should be made of petitioner's financial capacity to engage in security transactions of the magnitude disclosed in the security ledgers and in petitioner's brokers' accounts. Kerner then returned to Altoona and asked to see petitioner's records for past years' operations of the Blatchford Furniture Company. He was taken to the place where the records were supposed to be stored, but they could not be found. The only records available were records of monthly expenses, known as "Expense Summaries," and numerous customer record cards, sometimes referred to as customer ledger cards. Thereafter, Helen Kemp referred him to Young & Company, which company made available the worksheets which had been used to prepare petitioner's income tax returns for the years 1938 through 1944. Both Kerner and Devine were aware that petitioner's customer record ledger cards were available for *277 their inspection. These cards were filed on trays which were stored inside a vault located behind the cashier's cage on the street level of petitioner's store Neither agent examined or attempted in any way to determine the completeness or accuracy of these ledger cards. Both men believed the cards were wholly unreliable without some form of control or summary sheets. In the course of examining petitioner's records and the worksheets found in Young & Company's files, Kerner sought to reconcile petitioner's income with his net worth as of certain dates. When the reconciliation failed, Kerner decided that it was necessary to estimate petitioner's income according to the so-called net worth method. As a starting point, he took a statement of petitioner's assets and liabilities as of December 31, 1937, contained among the work papers of petitioner's accountants and based upon figures submitted by Helen Kemp which were reconcilable with a sworn statement submitted by petitioner in connection with a tax proceeding for the year 1935. Upon conferring with petitioner to determine the completeness of that balance sheet, it was modified to include: A piece of property referred to as the gas *278 station property, which petitioner had inherited prior to 1937 and valued at $10,000; a personal residence which was converted to rental property in subsequent years, and which was valued at $7,500; and the beginning of a savings account in the amount of $75. As so modified, the opening net worth statement used by respondent was as follows: December 31, 1937
Assets
Liabilities
Cash
$ 2,695.55
Accounts receivable
$210,884.22
Less: Reserve for unrealized profits
81,966.55
128,917.67
Inventory
42,637.28
Furniture and Fixtures
$ 7,077.69
Less: Reserve for depreciation
1,537.97
5,539.72
Autos and trucks
$ 6,207.57
Less: Reserve for depreciation
2,453.90
3,753.67
Buildings
$ 49,095.29
Less: Reserve for depreciation
736.44
48,358.85
Land
60,000.00
Securities
200.00
Gas station property
10,000.00
Personal residence
7,500.00
Savings and Loan stock
75.00
Total assets
$309,677.74
Accounts payable
$ 61,226.08
Notes payable - Altoona Trust Company
31,725.00
Notes payable - Other
56,892.31
Mortgage payable
50,000.00
Total liabilities
$199,843.39
Net worth
$109,834.35
The same *279 categories of assets and liabilities were used in the balance sheets prepared by respondent's agents showing petitioner's assets and liabilities as of the ends of the years 1938 through 1944, augmented by asset items reflecting bank accounts for the years 1940 through 1944, asset items reflecting the value of petitioner's "Converted personal residence" ("Building Less: Reserve for depreciation" and "Land - Converted residences") for the years 1940 and 1941, asset items reflecting the cost of leasehold improvements less depreciation for the years 1941 through 1944, an asset item reflecting the cost of petitioner's residence for the years 1941 through 1944, asset items reflecting the value or cost of buildings less reserve for depreciation and of land for the years 1941 through 1944, an asset item entitled "Mortgages Receivable" for the years 1942 through 1944, and an asset item entitled "Due from Brokers" for the years 1943 and 1944. These balance sheets are set out in detail in exhibit A and are specifically incorporated herein by this reference. The accounts receivable represent the unpaid installment obligations of petitioner's customers. This figure is reduced by a reserve for *280 unrealized profits. This reserve did not appear on any of Helen Kemp's balance sheets, for it was computed by petitioner's accountants and treated as a net worth item on their worksheets. It was also treated as a net worth item by the agent investigating petitioner's returns for the years 1936 and 1937. On December 31, 1944, this reserve had declined to $68,827.42. Kerner used the increase in net-worth-plus-expenditures formula to determine that petitioner received taxable income greatly in excess of that reported for the years 1938 through 1944. He applied the so-called bank-deposit method to determine that petitioner also had large amounts of unreported income during the years 1945, 1946, and 1947. Based upon Kerner's investigation, respondent determined that petitioner's net worth at the end of the year indicated was as follows: Year
Assets
Liabilities
Net Worth
1937
$309,677.74
$199,843.39
$109,834.35
1938
294,809.86
130,768.92
164,040.94
1939
316,959.25
148,741.62
168,217.63
1940
351,142.44
150,388.75
200,753.69
1941
388,776.36
131,360.49
257,415.87
1942
452,453.43
90,378.74
362,074.69
1943
588,385.88
90,407.22
497,978.66
1944
672,569.80
84,943.75
587,626.05
*281 By determining the difference between the net worth at the end of one year and the net worth at the end of the previous year, and adding to this difference the amount petitioner spent for income taxes and his estimated personal living expenses during the year, respondent reconstructed the petitioner's income for the years 1938 through 1944 as follows: Increase in
Estimated
Income Taxes
Total
Year
Net Worth
Personal Expenses
Paid
Income
1938
$ 54,206.59
$3,700.00
$ 2,219.50
$ 60,126.09
1939
4,176.69
4,320.98
1,418.40
9,916.07
1940
32,536.06
5,422.36
37,958.42
1941
56,662.18
5,594.01
62,256.19
1942
104,658.82
7,930.42
1,033.44
113,622.68
1943
135,903.97
7,962.96
13,219.88
157,086.81
1944
89,647.39
8,369.16
4,558.71
102,575.26
On his Federal income tax returns for the same years petitioner reported the following: Total
Taxable
Year
Sales
Expenses
Income
1938
$207,461.90
$ 83,655.85
$ (3,808.92)
1939
341,835.97
111,512.76
(14,390.32)
1940
351,821.14
111,699.69
[1] 10,530.53 1941
384,094.91
125,910.44
9,868.77
1942
347,546.26
128,308.06
32,641.89
1943
369,834.52
125,246.73
21,129.44
1944
396,681.21
133,431.16
27,620.68
*282 Petitioner's business net income was computed by use of the installment method of accounting. A gross profit percentage was determined for each year and applied to the cash collected pertaining to sales made during that year. In addition, gross profit percentages for prior years were applied to cash collections pertaining to sales made in prior years. The gross profit for a particular taxable year was obtained by adding the results of these computations, and to determine petitioner's net income the expenses were subtracted from the gross profit. Rental income, dividends, interest, and capital gains were added to the business net income to obtain the income reported on the returns. During all of the years involved in this proceeding the gas station property was leased to the Independent Oil Company at an annual rental of $780. This income was not reported on petitioner's income tax returns in any year. No deductions were claimed for expenses connected with this property. Sometime in 1940 *283 petitioner purchased a new home and converted his previous residence to rental property. The rental income from his converted residence amounted to $400 in 1940, $600 in 1941, $575 in 1942, $600 in 1943. $600 in 1944, and $475 in 1945. None of this rental income was reported by petitioner on his returns for any of these years. Petitioner did not claim deductions for any expenses connected with this rental property. Helen explained that she did not include the income from the gas station property and the converted residence in the total of petitioner's rental income because the former had been inherited and was a gift, and because gifts were not considered taxable income she did not think the income resulting from gift property was taxable either; and as for the converted residence, she had never claimed any expenses or reported any income from it when petitioner lived there so she did not think it was necessary to do so after he moved out. The opening net worth statement used by Kerner indicated notes payable in the amount of $56,892.31, which amount was characterized by respondent's agent as a "substantial unverified figure." Of this amount $43,742.31 appeared on the accountants' *284 worksheets for years other than and after 1937, but it did not appear on any of respondent's balance sheets for years after 1937. One of the agents indicated on a schedule prepared in an effort to identify petitioner's liabilities that $28,742.31 of this amount was owed to "C.I.T. Corporation" and the balance of $15,000 to some unknown creditor. Petitioner's liabilities consisted of ordinary accounts payable, notes payable to banks, notes payable to others, and mortgages payable. Among the notes payable to banks were certain obligations to the Altoona Trust Company, the amount of which was stipulated by the parties. The mortgages-payable figure represented the unpaid balance on a $50,000 mortgage incurred in 1937 at the time petitioner purchased a business lot and building which were valued at a total figure of $109,095.29 on his 1937 balance sheet (allocated $60,000 to "land" and $49,095.29 to "building"). The outstanding balance at the end of the year on this mortgage was stipulated for all years except 1937. Each year Helen Kemp submitted balance sheets to petitioner's accountants to assist them in preparing petitioner's Federal income tax returns. These balance sheets purport *285 to show the financial picture of the Blatchford Furniture Company, and they do not purport to include all of the assets or liabilities which the petitioner had as an individual at the end of the corresponding years. Helen never did include the value of the business lot and building acquired by petitioner in 1937 or the amount of the mortgage incurred when the building was purchased. Respondent accepted and used many of the figures on Helen's balance sheets in his net worth analysis. The balance sheets prepared by Helen Kemp indicate certain amounts designated as "Notes Payable to Banks" and "Notes Payable to Others," which exceed the amounts used by respondent in his net worth analysis under the corresponding captions "Notes payable-Altoona Trust Company" and "Notes payable - Other." The accounts-payable figures used by Helen and respondent agree for all years. In addition to the liabilities listed on Helen Kemp's balance sheets petitioner also had certain personal liabilities which were reported to Kerner at the time he conducted his investigation. Respondent erroneously determined that the personal liabilities of petitioner and the business liabilities on the balance sheets prepared *286 by Helen Kemp were conflicting versions of the same thing, and as a result he understated petitioner's liabilities for all of the years involved in this proceeding. For the first 3 years involved respondent accepted and included in his net worth analysis the "cash" figures appearing on Helen's balance sheets. During 1940 certain additional bank accounts were opened by petitioner or by Helen Kemp in his behalf. Some of these bank accounts were personal accounts and others were business accounts. A part of the money deposited to the business accounts represented deposits on "hold" or "layaway" purchases made by petitioner's customers. Respondent adjusted the end-of-year bank balances downward in some of these accounts without any explanation whatsoever. Certain other balances shown in petitioner's business accounts were included in the net worth analysis without any adjustment for checks outstanding at the end of the year. The proper "cash" figures for the business accounts were the amounts shown on Helen Kemp's balance sheets, and the difference between those figures and the amounts determined by respondent represents money belonging to petitioner's customers and adjustments required *287 as a result of checks outstanding at the time the banks rendered the statements. The following summary reflects the total deposits to business accounts as determined by respondent and the proper amounts we have found to be the correct "cash in banks" figures for petitioner's business for the years indicated: Amount
Proper Amount
Determined
as Indicated
Year
by Respondent
by Bookkeeper
1940
$ 5,558.00
$2,332.62
1941
9,891.13
5,176.03
1942
33,609.00
8,799.86
1943
36,093.60
5,777.50
1944
76,758.52
8,421.19
The evidence presented at the trial required further changes in the figures appearing on respondent's net worth statement. Respondent relied upon a number of exhibits prepared by the agents who investigated this case to establish bank balances in petitioner's personal accounts on December 31 of each year. In some instances respondent gave petitioner the benefit of the lesser of two figures, the December 31 and January 2 balances, which appear on the ledger sheets maintained by the banks. In other instances respondent used the greater of the two balances. In addition to the changes already noted in respondent's net worth analysis, the following *288 additional changes are made: Respondent's
Our
Statement
Finding
1938
Notes payable to bank
$ 17,150.00
$ 24,840.00
Notes payable to others
9,057.80
19,269.58
1939
Notes payable to banks
23,500.00
33,500.00
Notes payable to others
7,000.00
16,155.00
1940
Balance in personal account at The First
National
Bank of Altoona
3,627.03
3,277.03
Balance in personal account at Central Trust
Com-
pany of Altoona
504.72
Notes payable to banks
20,500.00
38,850.00
Notes payable to others
7,100.00
25,600.00
1941
Balance in personal account at Central Trust
Com-
pany of Altoona
504.72
Notes payable to banks
6,900.00
55,900.00
Notes payable to others
6,300.00
35,903.07
1942
Balance in personal account at Central Trust
Com-
pany of Altoona
5,304.72
4,800.00
Furniture and fixtures
16,807.68
7,128.82
Securities
38,059.91
37,184.91
Mortgages receivable
8,800.00
Notes payable to banks
49,500.00
Notes payable to others
4,300.00
26,800.00
1943
Balance in personal account at Central Trust
Com-
pany of Altoona
1,633.97
1,129.25
Real estate - buildings
19,073.72
5,846.93
Furniture and fixtures
15,547.28
6,482.20
Land
$ 2,320.00
$ 820.00
Securities
136,727.12
135,113.69
Mortgages receivable
7,600.00
Due from brokers
14,270.45
Notes payable to banks
39,500.00
Notes payable to others
3,000.00
21,500.00
1944
Balance in personal account at Central Trust
Com-
pany of Altoona
5,506.35
5,001.63
Furniture and fixtures
15,905.08
7,917.00
Securities
186,761.67
180,407.90
Real estate - buildings
25,537.50
5,619.73
Land
3,320.00
820.00
Mortgages receivable
6,500.00
Due from brokers
1,143.79
Notes payable to banks
29,650.00
Notes payable to others
3,000.00
26,500.00
*289 All of the above adjustments are an outgrowth of the evidence, most of which was produced by the respondent. The reasons for the changes not already set forth in our findings will be discussed in the opinion. The changes in respondent's determination resulting from the Court's findings are summarized as follows: Year
Assets
Liabilities
Net Worth
Increase
1937
$309,677.74
$156,101.08
$153,576.00
1938
294,809.86
148,670.70
146,139.16
$ (7,437.50)
1939
316,959.25
167,896.62
149,062.63
2,923.47
1940
347,032.34
174,172.79
172,859.55
23,796.92
1941
383,556.54
209,963.56
173,592.98
733.43
1942
407,785.71
162,378.74
245,406.97
71,813.99
1943
510,289.31 *
148,407.22
361,882.09 *
116,475.12 *
1944
559,324.34
138,093.75 *
421,230.59 *
59,348.50 *
Beginning with petitioner's return for the year 1945, Helen Kemp prepared the remaining income tax returns involved in this proceeding. In the preparation of these returns Helen was guided by the previous returns prepared by Young & Company. The following schedule *290 summarizes the information reported during the years 1945, 1946, and 1947: Year
Total Sales
Total Collections
Expenses
Income Reported
1945
$581,683.77
$595,087.47
$159,864.14
$87,734.55
1946
725,546.89
683,940.04
212,160.60
62,169.68
1947
668,454.96
643,645.32
228,987.74
29,730.00
The so-called bank-deposit method was used by respondent to determine petitioner's alleged income for the years 1945, 1946, and 1947. Respondent determined that petitioner had unidentified bank deposits as follows: 1945
1946
1947
Total Deposits
$957,194.77
$1,169,137.91
$922,709.53
Less: Transfers
104,000.00
103,092.86
34,000.00
Loans
20,000.00
24,900.00
30,000.00
Net Deposits
$833,194.77
$1,004,845.05
$858,709.53
Identified
802,813.01
822,110.40
702,338.18
Unidentified deposits
$ 30,381.76
$ 182,734.65
$156,371.35
Respondent determined that these unidentified deposits constituted additional taxable income which had not been reported by petitioner. Altoona was characterized as a railroad town, and the railroad workers, many of whom were petitioner's customers, were paid twice a month. Whether a worker was *291 an actual or merely a prospective customer, it was petitioner's custom to cash checks for these people. Prior to each railroad payday, Helen Kemp would withdraw money from one of petitioner's bank accounts in order to have sufficient cash on hand to cash such payroll checks as were presented. She would draw a check of $3,000 to $5,000 which would be paid in small bills. This service was necessary because many of the workers were unable to get off duty during banking hours. The redeposit of money withdrawn to cash checks for petitioner's customers accounts for a substantial portion of the so-called unidentified deposits which respondent determined to be income. The remainder of the deposits made by petitioner in the years 1945, 1946, and 1947, which could not be identified, represents deposits made by customers on "hold" or "layaway" transactions which were not treated as sales by petitioner until the merchandise was paid for and delivered to his customers. Petitioner was indicted for attempting to defeat and evade the payment of income taxes due and owing by him through the filing of a false and frandulent income tax return for the calendar year 1945. Helen Kemp was also indicted *292 along with petitioner. The case was tried in the United States District Court for the Eastern District of Pennsylvania on March 10, 11, and 12, 1953. Both petitioner and his bookkeeper were acquitted. On January 15, 1953, petitioner paid additional tax in the amount of $14,696 on the additional income from dividends and capital gains determined for the year 1945. Petitioner's failure to report the relatively large amounts of dividend income received by him in the years 1943 through 1947 was due to fraud and parts of the deficiencies for such years, to be determined pursuant to our opinion herein, are due to fraud with intent to evade the payment of taxes. Petitioner's returns for those years were fraudulent with intent to evade taxes. Accordingly, the statute of limitations does not bar the assessment and collection of such deficiencies for those years. * Petitioner understated his taxable income for the years 1943 and 1944 by the respective amounts of $116,528.52 ** and $44,655.69. **
*293 In the year 1945 petitioner failed to report amounts of net rental income and capital gains income in addition to the unreported dividends. The total of such unreported income, to be determined under Rule 50, constitutes an understatement of taxable income for this year. Credit will be given petitioner on account of the payment of additional tax made by him on January 23, 1953. In 1946 and 1947 petitioner failed to report net rental income in addition to the unreported dividends, but also failed to take deductions on account of capital losses. The total of such unreported income received less proper deductions on account of capital losses, all as determined under Rule 50, constitutes an understatement of taxable income for these years. For the years 1938 through 1942 petitioner's returns were not false or fraudulent with intent to evade tax. Therefore, the collection of any deficiencies in income tax for those years 1938 through 1942 is barred by the statute of limitations. Opinion KERN, Judge: Respondent contends that petitioner received taxable income from his business and security transactions substantially in excess of that reported on his income tax returns for the *294 years 1938 to 1947, inclusive, and that a part of the deficiency for each year is due to fraud with intent to evade the payment of taxes. To support his determination of deficiencies for the years 1938 to 1944, inclusive, he relies primarily upon certain alleged increases in petitioner's net worth which exceeded in each of these years the amount of taxable income reported. With regard to the deficiencies determined for the years 1945, 1946, and 1947 respondent relies upon certain deposits made to petitioner's bank accounts which exceed his identified receipts from all known sources as proof of his determination that petitioner received income during those years which he did not report. Respondent relies upon the consistent omission of large amounts of income, as determined by the foregoing methods, as establishing fraud in each of the taxable years. In addition, and alternatively, respondent contends that fraud is established in certain years by the consistent omission from reported income for those years of relatively large amounts of dividend income, receipt of which was not recorded in books originally exhibited to respondent's agents, and by the alleged practice during some years *295 of deliberately failing to record cash sales of over a certain amount. Petitioner contends that his business income may be accurately computed from his still existing business records, consisting primarily of innumerable customer ledger cards, and he denies that respondent's agents have the right to disregard these records and revert to secondary methods of proof merely because he failed to maintain a general ledger and no longer has certain daily, monthly, and yearly summaries which he contends were not required to be kept. He admits that some dividend, rental, and capital gains income was not reported, but he denies any fraudulent intent with regard thereto. The parties agree that in the event the respondent fails to prove that petitioner's returns were fraudulent with intent to evade the payment of taxes, the assessment and collection of any deficiency that may be found for any of the years 1938 to 1947, inclusive, are barred by the statute of limitations. Petitioner suggests that the failure of respondent's agents to inspect, even casually, the customer cards which were stored in chronological order and which were available in his store at all times relieved him of the burden *296 of showing that the cards were a complete and reliable source of determining his correct taxable income. He therefore took the position that it was not incumbent upon him to rebut respondent's determination of deficiencies until respondent proved that his books and records did not adequately reflect his income, and accordingly limited the scope of his evidence and refused to enter into any pretrial stipulation. Such few matters as were eventually stipulated were agreed upon orally at the trial. As a result the record in this case is excessively long and (to make an understatement) is far from satisfactory. Petitioner argues that the respondent must explicitly show by direct evidence that his books are unreliable before resorting to circumstantial proof of taxable income, relying upon United States v. Reganto, 121 F. Supp. 158. He contends that the failure of the revenue agents to audit his still existing books and records makes their content an unknown quantity and, not knowing what they would show, respondent may not and cannot show that the taxpayer's books and records are unreliable. In view of the discrepancies between reported income and increases in net worth *297 which we have found to exist in the instant case, an analysis of petitioner's books and records, whether offered by petitioner to establish their correctness or by respondent to show that they are unreliable, would either verify the taxable income figures reported on petitioner's returns or establish that the returns did not correctly report petitioner's taxable income as indicated by his books. If the latter, there would be no question as to respondent's right to use indirect or circumstantial methods of determining petitioner's correct tax liability. But, if the former, then the question arises as to whether the amount of taxable income reported by petitioner, whether or not supported by his records, adequately reflects the income actually received. If a net worth analysis indicates increases far beyond that which would, in the ordinary course of events, follow from the income reported as received by the taxpayer, and if these increases cannot be attributed to nontaxable sources, this is evidence that the returns, or the books which the returns are supposed to summarize, do not adequately reflect income. Morris Lipsitz, 21 T.C. 917, affd., 220 F. 2d 871, *298 certiorari denied 350 U.S. 845; Estate of George L. Cury, 23 T.C. 305, 333, 334. We do not agree with petitioner that an analysis of his books and records is a condition precedent to respondent's use of the net worth method. In Schultz v. Commissioner, 278 F. 2d 927, reversing, 30 T.C. 256 on another issue, the Court of Appeals for the Fifth Circuit had cause to answer a similar contention of another taxpayer, and in so doing said: The Taxpayer insists that under § 41 n2 the net income is to be computed in accordance with the method of accounting regularly employed by a taxpayer. Consequently, where a taxpayer keeps books and records, the [Commissioner] has the burden of first establishing that the records are faulty or either negligently or fraudulently fail to reflect items of income or disbursements. But this is clearly not so. This Court, with many others, is conscious of the dangers in the use of the net worth method n3 and will require that there be adequate evidence n4 to support a determination that the true income is represented by the process of reconstruction. But once that is satisfied, neither the method nor the *299 evidence undergoes an added scrutiny because the taxpayer's books are to this extent disregarded. Indeed, the determination that the trier of fact had requisite basis for concluding that income was truly that shown by the reconstruction process is a simultaneous determination that no matter how neatly or diligently or consistently or conscientiously kept, the books and records were inadequate. Whatever doubts may have existed prior to Holland v. United States, 1954, 348 U.S. 121, 75 S. Ct. 127, 90 9. Ed. 150, this is what we have now so held, Dupree v. United States, 5 Cir., 1955, 218 F. 2d 781, and so have others. Davis v. Commissioner, 7 Cir., 1956, 239 F. 2d 187. n5 [Footnotes omitted.] By statute a presumption of correctness attaches to the respondent's determination of deficiency with regard to the deficiencies in tax therein determined, while the burden is expressly put upon respondent to prove the existence of fraud and the validity of the fraud penalties determined. Thus the record in the same case may require a finding that there are deficiencies in tax and yet not support a conclusion that respondent has successfully borne his burden *300 of proof with regard to the fraud issue. See L. Schepp Co., 25 B.T.A. 419; Sidney Cohen, 27 T.C. 221. In the instant case we have concluded on the entire record that petitioner understated his income in the returns which he filed for most of the taxable years. We are unable to conclude that respondent has successfully borne his burden of proving fraud by establishing by clear and convincing evidence that there were such consistent omissions of large amounts of income as to constitute fraud. We take this view because of the unsatisfactory nature of some of respondent's evidence, the inaccuracies apparent in some of respondent's computations, the peculiarities of petitioner's method of accounting, and the chances for error present in any attempt to reconstruct a taxpayer's income by the so-called net worth or bank-deposit methods, and also with regard to the years prior to 1943 because our findings as to the deficiencies for those years do not justify a conclusion that there was any consistent pattern of understating income. Nor are we able to conclude that the respondent has successfully borne his burden of proving fraud by establishing by clear and *301 convincing evidence that there was a practice on the part of petitioner during the taxable years of deliberately failing to record cash sales of over a certain amount. Respondent's witnesses on this matter were inconsistent in their testimony and it was contradicted not only by witnesses produced by petitioner but also by exhibits introduced in evidence. In our opinion respondent's evidence with regard to this contention of fraud was not clear and convincing. However, we do conclude that there is clear and convincing proof of fraud with regard to the years 1943 through 1947 in that in those years petitioner knowingly and consistently omitted from reported gross income relatively large amounts of dividend income with regard to which an attempt was made to mislead respondent's agents. Petitioner admits, as he must under the evidence, that he omitted such income from his returns, and that he initially withheld from respondent's agents the record of its receipt. He attempts to explain this omission by the testimony of his bookkeeper to the effect that she thought that only those dividends constituted taxable income the payment of which had been reported by the payors to the Commissioner *302 of Internal Revenue. We do not believe this testimony. It seems to us much more likely that petitioner felt it safe to report only the dividend income known by him to have been reported to the Commissioner as having been paid to him, and to omit from his returns the remainder of his dividend income in an attempt to fraudulently evade the payment of taxes thereon, and we have so found. Before ending this opinion it seems to us pertinent to describe and discuss petitioner's method of accounting and also (to the extent not already set out in our findings) the various adjustments we have made in respondent's computation of petitioner's income. In the instant case petitioner operates several retail stores in which clothing, furniture, appliances, and jewelry are sold on an installment basis, and petitioner has elected to report his income using an approved version of the installment method of accounting. This particular method of reporting income is explicitly authorized by section 44 of the Internal Revenue Code of 1939. Numerous decisions of this Court have dealt with the difficulties of applying cash or accrual concepts to installment-basis taxpayers. See Blums, Inc., 7 B.T.A. 737; *303 The Hecht Co., 7 T.C. 643, affd. 163 F. 2d 194; Mackin Corporation, 7 T.C. 648, affd., 164 F. 2d 527; and Kimbrell's Home Furnish. v. Commissioner, 159 F. 2d 608. A taxpayer using the installment method is permitted to report as gross profit a percentage of the cash collected during the taxable year. Each payment is treated as a partial return of cost as well as the receipt of a portion of the profit ultimately expected to result from a peculiar sale. Depending upon business trends, actual sales may or may not exceed the cash collected during a given year, and, depending upon collections, the gross profit used to compute net income may be either more or less than the amount the taxpayer would be required to report if he were on the accrual basis. See Highland Merchandising Co., 18 T.C. 737. To reconcile the resulting changes in net worth with the changes to be expected if the taxpayer reported his income on the accrual basis, accountants have devised a deferred gross profit reserve or, as it was called in this case, a reserve for unrealized profit. The proper treatment of reserves of this type has been *304 the subject of much discussion among accountants. See Finney and Miller, Principles of Accounting, Advanced (4th ed.) 138, 139; Wixon, Accountants' Handbook, 11, 38, 39. These reserves are of a hybrid nature and consist not only of deferred income but also represent future offsets that may be required for collection costs, refunds, or repairs. If the amount in the reserve remained constant for all years, it would make no difference for our purposes whether it was treated as an element of net worth, as respondent treated it in the report of examination of petitioner's returns for the years 1936 and 1937, or as an offset to accounts receivable, as respondent treated it in his net worth analysis for the years involved herein. Because a reserve for unrealized profit contains a substantial element of deferred income, a decrease in the reserve from one year to another requires the inclusion in taxable income in the latter year of an amount not exceeding the decrease in the reserve. On the other hand, if the reserve shows an increase over the previous year, the amount of the increase attributable to deferred income is properly excludable from taxable income. In his net worth analysis respondent *305 offset this reserve against accounts receivable. Taking into consideration the modifications of the net worth statement required by the evidence, petitioner's initial net worth was $153,576.66 and his closing net worth was $421,230.59, * showing an overall increase of $267,653.93. * If the reserve for unrealized profit is treated as an element of net worth, however, the petitioner's increase in net worth would be $254,514.80, * based upon an opening net worth of $235,543.21 and a closing net worth of $490,058.01. * Included in the first figure would be $81,966.55 of deferred income, whereas the latter figure contains only $68,827.42 of deferred income. Obviously, sometime during the taxable years in issue, the decrease in deferred income of $13,139.13, obtained by subtracting the closing reserve from the opening reserve, must be reported for tax purposes. If the $13,139.13 is added to the $254,514.80, * it will exactly equal the increase obtained using respondent's method. While the latter method is more technically correct, respondent's method has the virtue of simplicity. *306 After carefully considering all aspects of the installment method and after making numerous reconstructions of petitioner's taxable income based upon increases in net worth, employing this reserve in a variety of ways as well as omitting it altogether, we are convinced that the method used by respondent correctly adjusts petitioner's reportable income to account for any adjustments which may be required by the installment method of accounting. In the instant case respondent assumed the burden of substantiating every figure contained in his net worth analysis and in many respects he succeeded in doing so. The lack of competent evidence pertaining to some items, as well as the difficulty of reconciling evidence and testimony relating to other items, compels us to discuss several items in some detail. The evidence relating to petitioner's bank deposits was particularly troublesome. Some bank balances reported by the bank, as indicated in letters introduced into evidence, have been reduced by respondent without any explanation whatsoever. In some cases respondent chose to use the lesser of the December 31 or January 2 balances, apparently on the assumption that the reduction was *307 the result of an outstanding check or checks from the previous year. In other cases respondent used the greater of the two balances, particularly if the larger balance was the result of a deposit made on the first business day of the following year. While respondent may well have made these adjustments on the basis of information available to him but not available to us, they appear in the absence of some explanation to be erroneous. Helen Kemp testified that possibly the cash figures she used on various balance sheets submitted by her to Young & Company took into account checks which were outstanding at the end of the year. At another point she suggested that perhaps she had picked up the balance from only one bank, but when asked to do so she could not show that any particular bank had a balance approximately equal to the amount she reported to Young & Company. It must be remembered that her testimony took place from 15 to 20 years after the fact and some of the banks destroyed their records while petitioner's own bank statements and checkbooks are no longer available. The balance sheets prepared by Helen Kemp did not purport to include funds which were the personal property of *308 petitioner and his family as distinguished from those Helen Kemp regarded as business funds. Respondent's own net worth analysis indicates that he believed at least some of the balances should be reduced. For these reasons and because respondent has himself accepted most of the figures on Helen Kemp's balance sheets as correct, and for the additional reason that those figures were prepared by Helen Kemp at a time when she might have been able to explain them in a more satisfactory manner, we have consolidated petitioner's business bank accounts and have found as a fact that the totals in these accounts did not exceed the amounts reported in the yearly balance sheets submitted to Young & Company by Helen Kemp. There was also some testimony to the effect that petitioner possessed sums of money of unspecified amounts which he received as deposits on "layaway" or "hold" sales, as well as for appliances not always available during and after the war years, which could not be regarded as either sales or collections until the merchandise was delivered. Certain customer ledger cards introduced into evidence support this contention. Considering some of the peculiar bookkeeping practices employed *309 by Helen Kemp, it is reasonable to believe that she kept some form of memoranda indicating the amount of such deposits and deducted it from the total cash indicated by the bank balances in order to determine the amount of cash properly belonging to petitioner's business at the end of each taxable year. The evidence produced by respondent to support his determination pertaining to petitioner's personal account in the Central Trust Company of Altoona is not clear. On the record before us we are of the opinion that the account did not exist prior to December 31, 1942, and have therefore found that petitioner did not deposit $504.72 in the Central Trust Company of Altoona sometime in 1940 and allow that account to remain undisturbed until December 31, 1942. Accordingly, we have eliminated the amount of $504.72 from petitioner's balance sheets for the years 1940 through 1944. Respondent determined that petitioner owned securities which cost $38,059.91 on December 31, 1942, $136,727.12 on December 31, 1943, and $186,761.67 on December 31, 1944. Careful examination of the ledger books upon which respondent relies to support his determination reveals that the actual cost of the securities *310 owned by petitioner on these dates was somewhat less than that determined by respondent. The difference cannot be completely reconciled, but certain entries made in the second ledger merely carried forward shares of stock purchased in 1942 and 1943 which were not sold until 1945 or later. We have adjusted our findings to reflect the amounts indicated by the ledgers upon which respondent relies. Respondent also determined a substantial increase in petitioner's furniture and fixtures account in 1942, which increase, after allowance for depreciation, amounts to $9,678.86. To substantiate this increase respondent relies upon a report of a revenue agent attached to a 30-day letter addressed to petitioner in 1953. This report was admitted into evidence solely to guide the Court in following the respondent's computations. The workpapers and financial statements from Young & Company's files were the only other evidence pertaining to this account, all of which were prepared by persons familiar with the property and contemporaneous with the facts. Based upon these documents, we have found as a fact that the furniture and fixtures account was not increased during the year 1942 by the amount *311 of $9,678.86 and respondent's determination with regard thereto cannot be sustained. For the years prior to 1942 respondent's net worth statement contained accounts for "Real Estate - Buildings" and "Land" and the amounts included in this account represented petitioner's former personal residence and lot which had been converted to rental property in 1939. Certain additions were made to these accounts by respondent in 1943 and 1944, apparently to reflect additional rental property acquired by petitioner in those years. On the record before us we are of the opinion that these increases were not warranted, and have therefore not included this property in petitioner's net worth. We are also unable to agree with respondent's inclusion of "Mortgages Receivable" items in petitioner's net worth as of December 31, 1942, 1943, and 1944. This is also true of amounts which respondent contends were "Due from Brokers" as of December 31, 1943 and 1944. It was Helen Kemp's practice to submit a balance sheet, a profit and loss statement, and a list of expenses to Young & Company every year to serve as a basis for computation of petitioner's income tax liability. We are of the opinion that the *312 balance sheet was intended to cover the business affairs of the Blatchford Furniture Company as an entity, and that Helen Kemp did not attempt to include all of petitioner's assets and liabilities, and that the store lot and building, valued in excess of $120,000, were never included in these balance sheets, even though depreciation pertaining to the building was computed by the accountants as an additional expense item. The mortgage, which was apparently placed with an insurance company rather than a bank, was also omitted from Helen's balance sheets. The parties orally stipulated the amount due on this mortgage for all years other than 1937. These balance sheets include for all years certain amounts designated as "Notes Payable to Banks" and "Notes Payable to Others." In all years the amounts included thereon exceed the respondent's determination under the corresponding headings "Notes Payable - Altoona Trust Co." and "Notes Payable - Other." Petitioner stipulated the amount of the notes held by the Altoona Trust Company as of the close of all years was the amount determined by the respondent. But that is for a specific indebtedness only. It does not preclude the existence of other *313 notes payable to other banks, as respondent seems to believe it does. On Helen Kemp's balance sheets the word "bank" was often pluralized whenever it was used, and we have found as a fact that the petitioner's liabilities for all years were not less than the amounts indicated on Helen Kemp's balance sheets. To support the lesser amounts determined by him to be petitioner's correct liabilities, respondent relied upon a summary prepared by the revenue agent assigned to investigate the case. When questioned as to the source of his information, the agent stated that his summary was based upon information furnished him by Helen Kemp. So, whether we use respondent's determination or the amounts indicated on the balance sheets prepared by Helen Kemp, the only source of information for these amounts would be Helen Kemp. Under the circumstances, we choose to rely upon the statement made contemporaneously with the fact rather than one given years later. No attempt was made by respondent to rule out the possibility of liabilities to banks other than the Altoona Trust Company or to show in any way other than referring to the revenue agent's report that the liabilities on the Kemp balance sheets *314 were overstated. As we have said before, the revenue agent's report is not proof of anything, and it cannot be relied upon to support the respondent's determination. The source of the information in the exhibit upon which respondent relies to support his determination of "Loans Payable - Other" was Helen Kemp. On its face this exhibit states that it is a summary and analysis of the loans payable of James E. Blatchford as an individual, and it does not purport to include petitioner's business liabilities. Most of the loans are from members of petitioner's family, except for items labeled "Unknown $15,000.00" and "C.I.T. Corporation $28,742.31," which appear in the column pertaining to the year 1937 only. [1] This entry was apparently an attempt on the part of the agent to include the amount of $43,743.31 which first appeared on some worksheets of petitioner's accountants in 1937, and was carried for a number of years thereafter, although it was not included as a liability by Helen Kemp in any year and was used by respondent in his net worth analysis only for the year 1937. The evidence pertaining to liabilities is ambiguous. We have found as a fact that petitioner not only had loans *315 and notes payable equivalent to those contained on Helen Kemp's balance sheets, but in addition he also had certain personal obligations which were detailed to respondent's agent and mistakenly construed as a summary of his business obligations. There is evidence in the record that certain adjustments in receipts exceeding $15,000 in each year were made by respondent as a result of examining petitioner's returns for the years 1936 and 1937, the effect of which was to increase petitioner's net income. The petitioner has the burden of showing that the respondent's determination is erroneous and, having failed to do so, we cannot speculate as to what part, if any, of the increase in net worth was due to similar bookkeeping errors made during the taxable years 1938 through 1944. For the years 1945, 1946, and 1947 respondent used the so-called bank-deposit method to determine additional deficiencies for those *316 years. The evidence indicates that petitioner customarily cashed checks as a courtesy to his customers, and our findings indicate that the withdrawal and redeposit of funds for this purpose, together with deposits on "hold" and "layaway" sales, were of sufficient quantity to account for the deposits which respondent could not identify. Respondent determined that petitioner is subject to an addition to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for substantially underestimating his tax for the taxable year 1944. An addition to tax under section 294(d)(2) is a part of petitioner's tax liability as determined by respondent which is presumed to be correct unless the petitioner proves to the contrary. The only thing in the record remotely relating to petitioner's underestimate of his tax for the year 1944 is his income tax return for that year, and it appears on its face to support respondent rather than petitioner. Tax returns are not acceptable proof of the facts reported therein; Swayne Lumber Co., 25 B.T.A. 335; and their use as evidence has been limited. Old Mission P. Cement Co. v. Commissioner, 69 F. 2d 676; Kreis' Estate v. Commissioner, 227 F. 2d 753, *317 affirming a Memorandum Opinion of this Court; Bedell v. Commissioner, 30 F. 2d 622. Petitioner, having failed to prove that respondent's determination with respect to the addition to tax for the taxable year 1944 authorized by section 294(d)(2) was erroneous, is liable for such addition, the amount of which will be determined in a recomputation under Rule 50. Decision will be entered under Rule 50. Footnotes
1. This figure represents the income that would have been reported had petitioner not had a loss carryover from the previous year. The figure on the return represents a loss of $3,491.54.↩
*. These figures were amended by an official order of the Tax Court, dated April 23, 1963 and signed by Judge Kern.↩
*. The following 3 paragraphs were amended by an official order of the Tax Court, dated April 10, 1963 and signed by Judge Kern. ↩
**. These figures were amended by an official order of the Tax Court, dated April 23, 1963 and signed by Judge Kern.↩
*. These figures were amended by an official order of the Tax Court, dated April 23, 1963 and signed by Judge Kern.↩
1. An extension of the "C.I.T. Corporation" entry in the amount of $1,007.80 appears in the column pertaining to the year 1938, but no other entries are made for subsequent years, although most of the other loans remain more or less at the same level over a period of years.↩